No. 76,539

STATE OF KANSAS, *Appellee*, v. MICHAEL A. WHITE, *Appellant*.
(950 P.2d 1316)

Opinion filed December 12, 1997.

*Rebecca E. Woodman*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Delia M. York*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Michael White from his conviction of first-degree premeditated murder. He was sentenced to life imprisonment without the possibility of parole for 40 years (hard 40).

White appeals, claiming evidence of gruesome photographs and that he had battered his girlfriend was improperly admitted into trial, the evidence admitted to prove first-degree premeditated murder and to support the hard 40 sentence was insufficient, and cumulative error requires reversal of his conviction. White also contends that the State erred by failing to comply with the mandatory notice provisions of K.S.A. 1993 Supp. 21-4624(1) and erred by not holding a competency hearing prior to sentencing.

White killed his mother, Pearl White, by striking her on the head one time with the side of a hammer. He subsequently disposed of her remains by cutting her body in half and burying each half in the back yard. White claimed self-defense.

When the evidence is viewed as we are required to view it, the facts are as follows. White served 2 years in prison for aggravated robbery. He was released from prison in 1991. In November 1991, White was involved in an accident which crushed bones in his leg. After the injury, White moved in with his mother in a small two-bedroom house in Kansas City, Kansas. White's grandmother, who had Alzheimer's disease, also lived at the residence. According to family members and friends, White and his mother got along well with each other. White began working at a restaurant in March or April 1992. At some point, White developed a cocaine habit.

On May 8, 1992, Belinda Fantroy, White's sister and the victim's daughter, picked White up after work. She took him to cash his paycheck. White asked Belinda to hold onto the cash ($200) for him. She agreed to do so. She dropped White off at her mother's house around 5 p.m. Belinda talked to her mother on the porch, gave her a Mother's Day gift, and left around 5:30 p.m. Belinda saw no friction between Pearl White and defendant at that time. According to Belinda, her brother and mother got along well with each other. However, Belinda testified that it was her understanding White was not helping Pearl White out at home with the expenses. Pearl White had previously told Belinda that she was mad at White and if White did not give her any money by the end of that week, she would be "putting him out."

Around midnight on May 8, 1992, White called Sherry Heggie, an ex-girlfriend and the mother of his child. White told Sherry to come over to the house after work and get some money for their son. Sherry, who is a deputy sheriff, got off work about 12:30 a.m. on May 9 and went to the White residence. Sherry took White to Belinda's house so White could get the cash Belinda was holding for him. Belinda gave White his $200. White gave Sherry $40; then Sherry drove him back home. When they got halfway to Pearl White's house, White told Sherry that he would walk the rest of the way home. Sherry refused to drop White off, and she drove him all the way home. Sherry testified that White seemed normal when they went over to Belinda's house and he seemed normal when she dropped him off at home. However, Sherry testified that White asked her if she was going to talk to him again. He seemed concerned, but she did not know why.

Sherry left and went to her house, which was about 20 minutes away. After she was home for about 5 minutes, she called White's house, but there was no answer, so she went to bed. The next morning, Sherry called White about 9 or 10. White answered, and Sherry asked him what had happened the previous night. White replied that his mother was missing and that he had been out looking for her.

Kathy White, another ex-girlfriend of White's, had a casual conversation with White on the telephone on the morning of May 8.

White was supposed to call her back before she got off work at midnight, but he never called. She called White's house at about 12:30 a.m. on May 9, and talked to Pearl White. Pearl White told her that White was at Belinda's house, and that he had called and was on his way back home. Kathy told Pearl White that she would call again when she got home from work. She called at around 1 a.m. and again talked to Pearl White. When she called back at 1:30 a.m., there was no answer. Kathy called again at around 2 a.m., and every ½ hour thereafter, with no answer, until 6 a.m., when she went to bed. Kathy did not try to contact White again on Saturday. However, White's employer called Kathy at home three times that day, at 8 a.m., noon, and 3 p.m., asking if she had seen or heard from White.

White called Kathy at work on Saturday evening at 6:30. She asked where he had been the night before, and he told her he had been with Belinda and then with a friend. She asked where his mother was, and White just said his mother was not there. White called Kathy the following day, on Sunday, May 10, to wish Kathy a happy Mother's Day. He called her twice that day, once before she went to work, and once while she was at work. The second time she talked to White he said he was taking phone messages from people calling to wish his mother a happy Mother's Day.

Kathy talked to White again on Monday, May 11, while she was at work. White told her that he and his mother had had an argument on Friday evening "over money." Kathy testified that apparently Pearl White was asking for more money than White was willing to give her. Pearl White wanted White's whole paycheck, but White told her he was not going to give her the whole check. White told Kathy that his mother made him leave the house, so he left.

Michael Lewis, Belinda's fiance, testified that he went over to Pearl White's house around 1 p.m. on Saturday, May 9. Lewis said he knocked for a minute, and then White let him in. According to Lewis, White was lying down on the divan, and he was concerned about "when . . . the next money [was] coming in." Then, Lewis testified, Pearl White's bedroom door flew open. Lewis looked in the door. There were no sheets on the bed, and there was a spot on top of the mattress. Lewis testified that White shut the door

very quickly. Lewis was at the house for 3 hours, but he did not ask White about why the sheets were not on Pearl White's bed, nor did he inquire about the spot on her bed. Lewis said he wanted to keep his thoughts to himself.

Pearl White's next-door neighbor, Consuelo Mendiola, testified that on Sunday, May 10, she had hired a yardman to do some work at her house and had asked the yardman to bring a shovel. The yardman, Oscar Sharp, came over in the afternoon and worked about ½ hour. Consuelo testified that when the yard work was finished, she saw him go home, and then she saw the next-door neighbor (a male) standing in the front of Pearl White's house with a shovel. Sharp, the yardman, testified that he went to Consuelo's house around 11 a.m. on May 10 and worked for 30 or 40 minutes. When he left, he was walking up the street, and White asked him if he could borrow the shovel. Sharp asked White why he needed the shovel, and White said that he needed to dig some dirt out of the basement. Sharp allowed White to borrow the shovel. When Sharp came back in the evening to retrieve the shovel, White was not there. Sharp went back to White's house the next day, picked up the shovel, and went home. Consuelo testified that the day after she had her yard work done, she took out the trash and saw her next-door neighbor with the shovel, digging in the dirt in the back of his house.

Sherry Heggie went over to Pearl White's house 1 or 2 weeks after Pearl White's disappearance because White had asked to see their son. Sherry testified that White showed concern about his mother and acted nervous. Sherry said that at the house, she noticed new unopened sheets on the chest of drawers in Pearl White's bedroom and saw old sheets rolled up. She did not look at the sheets or ask White about them.

Belinda testified that on Sunday, May 23, White called her and asked her to come by the house and bring groceries. When she arrived, White came out of the house and asked her if they could go for a ride. While they drove around the block, White told Belinda that he had sold the furniture and appliances in the house to a "dope man."

On Wednesday, May 27, Belinda went over to Pearl White's house to move her grandmother to a nursing home. White was at work, but Belinda had already told him she was going to the house. Belinda testified that almost everything was gone from inside the house—dining room table, three chairs, living room set, microwave, color television, and black and white television.

Belinda took White to his work on Sunday morning, May 31. She told White that she was going to go to Pearl White's house to retrieve their grandmother's cedar chest and antique dresser. She testified she got to the house at around 8 a.m., accompanied by her fiance, Michael Lewis, and another man named Robert. The bed in her mother's room was stripped. Belinda said she looked under the mattress and there was a "bluish looking" stain on the bottom side. After she took the cedar chest and dresser out, she wanted to see what was in the back yard. She was aware of a fresh pile of dirt in her mother's back yard. A few days after Pearl White disappeared, the dirt pile had been reported to the police. The police looked at the pile and concluded that it did not conceal a body. Now, Belinda wanted to check the dirt pile out for herself. Robert had brought a shovel with him, and the three started digging into the fresh dirt pile in the back yard. Belinda and Lewis both testified that they dug down about 3 feet and saw a blanket and sheet. Belinda said she recognized the blanket as one of a set of three she and her mother had ordered, and the sheet as being off of her brother's bed. Belinda went into the house and called her cousin, Adrian Davis, who also owned the house, and asked him to come over. Adrian called the police, and then he came over to the house with a shovel.

Several officers responded to the scene. Officer Moran observed a piece of bloody cloth lying underneath some dirt. The officers began to dig into the ground. The police dug up a human body which had been completely cut in half. The body was identified as Pearl White.

After discovering the body, the police picked White up from his place of employment and brought him in for questioning. White waived his *Miranda* rights. White told Detective Smith, the interrogating officer, that on or about May 9 he had had an argument

with his mother about money he owed her. His mother had slapped him. The next thing he remembered was his mother lying on the bed covered with blood. White told the detective that he did not bury his mother in the back yard.

An autopsy was performed on the body of Pearl White on the same day the body was discovered. Dr. Allan Roth, who performed the autopsy, testified that the body had been cut into two parts about 10½ inches below the sphenoid bone at the pit of the stomach. Dr. Roth estimated the body to have been between 5 feet 8 inches and 6 feet tall, weighing in excess of 300 pounds. Dr. Roth testified that the body was probably cut in half after Pearl White had been dead for a few hours and her body had cooled off.

Dr. Roth concluded that Pearl White's cause of death was a skull fracture. According to Dr. Roth, Pearl White's wound was consistent with one blow by a hard object. Dr. Roth testified that the wound was not consistent with a blow from either end of a hammer, because the scalp would likely have been torn by such a hit. However, Dr. Roth said that the injury was consistent with a blow from the side of the hammer. There was no other evidence of pre-death injury to the body.

At trial, White testified on his own behalf. White testified that he gave his mother $75 when he got home from work on the evening of May 8, and he asked his sister to hold the other $200 of his paycheck for him. Later that night, at 11:30 p.m. or midnight, he called Sherry Heggie and told her to come over to get some money for their son. His mother overheard the conversation with Sherry and asked him how he could give somebody else money when he was not giving her enough money. She was upset because he had given her only a small amount of money from his last two paychecks, and he had spent the rest of his money on cocaine. White tried to explain to Pearl White that it was almost Mother's Day and that he needed the money to buy presents for several people. His mother did not care about that; she wanted the money, and she told White "what an ungrateful son-of-a-bitch" he was. White decided to go ahead and get his money from Belinda and give his mother some more of the money because, otherwise, his

mother threatened to tell Sherry and Kathy that he had been raped in prison.

Sherry picked White up from Pearl White's house about 12:45 a.m. and took him to Belinda's house where he got the money from Belinda and left with Sherry. White gave Sherry $40. White testified he tried to get Sherry to drop him off halfway home. His mother told White that she was upset and was going to leave, and that "[White] better have [his] ass back there with the money before she left or she would throw [his] shit out into the street." White thought that Sherry dropping him off would give his mother time to leave the house before he got home. Sherry refused to drop him off. Instead, she took him all the way home. After Sherry took him home, White walked down the street to a phone and called to see if his mother was still home. His mother answered the phone and told him he had better come back to the house and bring all the money with him.

White went home and told his mother he would give her half of the remaining $160. He laid half of the money on the table. She did not want half, she wanted it all, and she started cussing at him again. White testified that he sat there and did not say anything because talking would just make her mad. Then, White testified that his mother started slapping him while he sat silently on the couch. In doing this, she got so close to White that she stepped on his injured leg. When White attempted to get his leg out of the way, he twisted his crushed ankle, which hurt very much.

White testified:

"[S]o, I struck out and I didn't mean to hit her, I did not mean to hit her and that's—that really got her upset because I never touched my mother and I never really talked back to her, so she went in her room and I knew the best thing for me to do was to leave because there was nothing else I could do. . . . I couldn't apologize for what I had done because she wouldn't listen, she was too mad and when I got to the door I guess she knew I was going to leave and she came out of her room and I thought she was going to hit me again, so I put my hands up and she hit me on my forearm and it was a hammer and I didn't know she had anything in her hand, so I grabbed ahold of it and all I did was try to hold it because saying anything to her while she was cussing at me wasn't going to help, so I just held on to the hammer and she tried to get it away from me. By that time we were in the bedroom, which is only about 2 feet from the front door and

she just let go of the hammer, so I fell backwards, but I still had ahold of it because I never let it go and she was standing right by the closet and she reached into the closet. She reached into the closet and she pulled out the shotgun and I didn't know what to do. I didn't have no time to think. I was [lying] on the floor. The next thing I know my mother was [lying] on the bed and there was all this—there was all this blood . . . ."

By Sunday, White testified, he was really "freaking out" because his mother was dead. He thought about killing himself, but then he saw the yardman with a shovel and asked if he could borrow it. He testified:

"I couldn't tell anybody that my mother was dead. I mean, this was my mother . . . no matter how it happened it was my mother and I was ashamed of it, so I went in the backyard and I dug a hole and then I came back in the house and I grabbed most of the sheets that I could find and I covered the body up because I couldn't look at it and when I had it covered up so I couldn't see anything, I tried to move her and she was too heavy. . . . [S]he was too heavy, but . . . I got her body into the hole and I covered it up and I came back in the house and I cleaned everything up."

White claimed not to know how he got his mother's body into the grave, but assumed that he cut her in half because she was too heavy to move. White testified he broke down the shotgun and put it, along with the knife, the hammer, and the pillows, in a trash bag and put them in the trash can across the street. People started calling to wish his mother a happy Mother's Day, and "[his] mother was dead, so [White] told anybody who called that she wasn't at home, and if anybody asked where she was [White] told them that [he] didn't know."

In the days that followed, White kept the door to his mother's room closed because he could not stand to be in there. He could not eat because all he did every day was relive what had happened. He started using more cocaine because it provided him with a few hours of relief, but when he started using cocaine more and more he could not pay the bills. When he sold all the furniture, he knew he was not going to make it, so he called his sister and told her they needed to get their grandmother out of the house because he could not take care of her much longer. His sister then arranged with their mother's caseworker to have the grandmother moved out.

The trial court instructed the jury on the lesser included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter. The trial court also instructed the jury on the law of self-defense. The jury returned a verdict finding White guilty of first-degree premeditated murder.

The trial court ordered a presentence investigation to be conducted on White at Larned State Security Hospital. White had attempted suicide three times while in the Wyandotte County jail. The staff at Larned concluded that White was dangerous to himself because of his suicidal behavior and was dangerous to others because of his drug and alcohol addiction. Thus, the Larned staff recommended that White be committed to Larned for care and treatment in lieu of imprisonment.

In November 1995, a K.S.A. 60-1507 motion was filed by White notifying the trial court that no notice of appeal had ever been filed in this case because he had never been informed of his right to appeal. Subsequently, the trial court granted leave to White to file an appeal out of time, and the court appointed counsel to represent White on appeal. White filed a notice of appeal on March 1, 1996.

Additional facts will be stated as they pertain to the specific issues raised below.

## I. PREMEDITATED MURDER

On appeal, White contends that the evidence was insufficient as a matter of law to establish that he killed his mother with premeditation. Since the element of premeditation was not proven, White claims that the evidence was insufficient to convict him of first-degree premeditated murder. White asks this court to overturn his conviction for insufficient evidence.

"Where the sufficiency of evidence in a criminal case is challenged on appeal, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Orr*, 262 Kan. 312, Syl. ¶ 10, 940 P.2d 42 (1997).

"A conviction of even the gravest offense may be sustained by circumstantial evidence." *State v. Smith*, 245 Kan. 381, 393, 781 P.2d 666 (1989).

In support of his argument that the evidence was insufficient to prove premeditation, White cites the definition of premeditation. Premeditation means to have planned, contrived, schemed, and thought over the matter beforehand, although no particular amount of time must intervene between the time the killing is planned and the time it is consummated. PIK Crim. 3d 56.04(b) (1994 Supp.); *State v. Greenwood*, 197 Kan. 676, 685, 421 P.2d 24 (1966); see *State v. McGaffin*, 36 Kan. 315, 319, 13 Pac. 560 (1887). In response, the State points out that premeditation may be inferred from various circumstances, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless. See *State v. Henson*, 221 Kan. 635, 639, 562 P.2d 51 (1977) (citing 1 Wharton's Criminal Evidence, p. 227 [13th ed.]). White contends that none of the above factors indicate that he acted with premeditation when he killed his mother. Instead, White asserts that each of these factors demonstrates that he did not act with premeditation. Thus, White contends the evidence was insufficient to convict him of first-degree premeditated murder.

Under the first factor which implies premeditation—the nature of the weapon used—the State points out that White used a hammer to crush his mother's skull with one vigorous blow. The hammer did such extensive damage that almost the entire back of Pearl White's skull was fractured. The pathologist did not even have to use a saw to cut through the bone of Pearl White's skull. He simply removed the fractured part of her skull, and a very large area of the brain was exposed. The State argues that a hammer is obviously a deadly weapon, which indicates White had acted with premeditation when he killed his mother.

White concedes that he hit his mother in the head with a hammer, and he concedes that a hammer constitutes a deadly weapon. However, White claims that he did not think ahead and provide the weapon or have it available to kill his mother. Instead, his mother picked up the hammer and used it on him; then, White asserts, he only used the hammer on his mother in self-defense.

Further, White points out that premeditation cannot be inferred from the use of a deadly weapon alone. Other circumstances, such as those listed above, must exist, in addition to the use of a deadly weapon, in order to support an inference of premeditation. See *Henson*, 221 Kan. at 639 (citing *State v. Hamilton*, 216 Kan. 559, Syl. ¶ 6, 534 P.2d 226 [1975]). According to White, none of these other circumstances or factors exist in this case.

The second factor from which premeditation may be inferred is the lack of provocation. White argues that there is not a "lack of provocation" in this case. Instead, the only evidence presented, according to White, is that he killed his mother in the heat of a physically violent argument which his mother instigated due to her desire for more money. White told Kathy White about the fight he had with his mother less than 3 days after it occurred. He also told the interrogating officer this same story following his arrest on May 31. Finally, White testified about this fight at trial. White testified that when he offered his mother part, but not all, of his paycheck, she started cussing at him. According to White's trial testimony, he just sat there unresponsive while she yelled at him because saying anything would have made her angrier. Then, White claims that his mother slapped him and stepped on his injured leg. At this point, White testified, he hit his mother and she went into her bedroom, but when White tried to leave the house, she came out of her room and hit him with a hammer. White testified that the two struggled over the hammer; then she let go of the hammer, and he fell backward with the hammer in his hands. At this point, White claimed, his mother pulled a shotgun out of the closet, and he did not have any time to think. The next thing White remembers is his mother lying on the bed covered in blood. Based on this evidence, White claims that there is no showing of a "lack of provocation" in this case. According to White, his mother clearly provoked him and required him to defend himself.

On the other hand, the State argues that there is no corroborating evidence which indicates Pearl White provoked White. The shotgun which Pearl White supposedly pulled out of the closet was never found. No one other than White ever saw the gun, and no one other than White testified that Pearl White even owned a shot-

gun. In fact, the State points out that White's own "provocation" story changed between the time he talked to Detective Smith and when he testified at trial. White told Detective Smith that his mother was angry because he did not give her his whole paycheck, so she slapped him and then he "saw red." At trial, White elaborated on this story, saying that he tried to leave after his mother slapped him, but she hit him with a hammer and then she pulled out a shotgun, so he had to hit her with a hammer in order to protect himself. The State points out that it is the jury's function to weigh the evidence and pass on the credibility of witnesses. *State v. Timley*, 255 Kan. 286, 308, 875 P.2d 242 (1994). According to the State, the jury heard both of White's provocation stories, the one he told the detective and the one he testified to at trial, and the jury weighed White's credibility. Apparently, the State argues, the jury did not believe White's story that he was provoked into his actions. Instead, the State claims that White planned this killing because he needed to keep his money in order to fund his drug habit and because he was about to be put out of the only home available to him. As such, the State contends, there was a "lack of provocation" which indicates that White acted with premeditation. We agree.

The next factor from which premeditation may be inferred is White's conduct before and after the killing. According to the State, White's conduct in taking affirmative and intentional steps to destroy and conceal evidence of the crime after he killed his mother indicates that he premeditated the killing. For instance, White cut his mother's body in half in order to carry it outside so he could bury it in the back yard. White also broke down the shotgun (if it even existed) and put it, along with the pillows, the knife, and the hammer, in trash bags, which he put in the dumpster across the street. White lied to his sister and friends about his mother's whereabouts, sold all of his mother's furniture, and bought drugs with the money. Finally, after killing his mother, White continued to live in the house where he had killed her. White's conduct after the killing indicates, according to the State, that White premeditated his mother's killing. We agree.

The next factor from which premeditation may be inferred is any threats or declarations White made before or during the occurrence. White contends that no evidence of such threats or declarations exist. However, when Sherry Heggie took White back to his mother's house after he retrieved his money from Belinda, White was hesitant about going home. He wanted Sherry to drop him off halfway home, possibly to give him an alibi so he could say he never went home that night and no one, including Sherry, would have proof that he did. Sherry refused to drop White off, and she took him all the way home. Once at home, White asked Sherry if she would still talk to him again. Sherry did not know what White meant. This suggests that White may have been planning to kill his mother, and he hoped Sherry would not be so disgusted with his actions that she would still talk to him. We think this evidence indicates premeditation.

The next factor from which premeditation may be inferred is lethal blows dealt after the "deceased is felled and rendered helpless." Dr. Roth testified that Pearl White died from a skull fracture, which was consistent with one blow to the head with the side of a hammer. There were no other abrasions, bruises, or fractures on Pearl White's body. White concedes that the body was cut in half. However, he points to Dr. Roth's testimony that this cutting occurred several hours after death, once the body had cooled off. Thus, White claims that this cutting was done to facilitate burial, not to inflict another lethal blow after the deceased was felled or rendered helpless. In support of this argument, White points to his trial testimony in which he assumed he cut the body in half because the 6-foot, 300-pound body was too heavy to move. White concedes that cutting the body in half so he could carry it outside to bury it indicates a premeditation to bury the body. However, White asserts that a premeditation to bury does not equal a premeditation to kill. The State does not directly address this factor. However, these facts indicate that Pearl White's body was too heavy for White to move off the bed without cutting her in half. If White could not move his mother's body off of the bed, then he could not have lifted it onto the bed. Thus, these facts provide circumstantial evidence that Pearl White was lying down on the bed when the fatal

blow was struck to the back of the head (or she somehow fell onto the bed when struck, which seems unlikely). This circumstantial evidence—that White struck his mother in the back of the head while she was lying down on the bed—indicates premeditation.

Looking at all of the evidence in the light most favorable to the State, the following evidence shows White thought about committing this murder before it occurred: the use of a deadly weapon, his differing provocation stories, his conduct after the killing, the statement he made to Sherry Heggie, and the circumstantial evidence from which a jury could conclude his mother was struck on the back of the head while lying down in bed. The jury obviously did not believe White's version of what occurred. We hold that the evidence is sufficient to prove premeditation and that a reasonable jury could have found White guilty of premeditated murder beyond a reasonable doubt.

## II. GRUESOME PHOTOGRAPHS

The pathologist, Dr. Roth, testified regarding the cause of Pearl White's death and the condition of her body. The cause of Pearl White's death was a blow to her head, causing a large skull fracture. There were no other bruises or marks on the body, and no other evidence of injury. No photographs were introduced showing the head injury. During Roth's testimony, the State introduced Exhibit 32, a photograph of Pearl White's body right before the autopsy was to begin. Roth identified the exhibit as a photograph of the body with him in the dissection process, although he had not yet cut or made any marks on the body. The photograph shows the two parts of Pearl White's naked body on the autopsy table. The internal organs are protruding from each end and the skin is in a decomposed state, with portions hanging on the table.

White objected to the admission of Exhibit 32, claiming that the photograph was inflammatory, prejudicial, and depicted a "gross scene." In response, the State argued that the photograph was relevant to the condition in which the body was found, to the manner in which White disposed of the body, and to the issue of premeditation. The trial court admitted the exhibit.

The State also called Raymond Thebo, a Kansas City, Kansas, police officer, as a witness. Officer Thebo was present when Pearl White's body was discovered, and he took pictures of the scene. Thebo testified that when he first saw the body as it was being uncovered, the lower half of the body was exposed with the back side facing up. The prosecutor then asked Thebo about Exhibit 5, which Thebo described as "a picture I took as we got the back side of the victim fully exposed . . . showing the lower portion of the body and the clothes that were on it and one shoe." White objected to Exhibit 5 on the same grounds that he objected to Exhibit 32, claiming that the exhibit was redundant and unnecessary. Without a response from the State, the court admitted Exhibit 5, which was then passed on to the jury.

On appeal, White contends that the trial court abused its discretion in admitting the State's Exhibits 32 and 5. In response, the State contends that both photographic exhibits were properly admitted into evidence. In support of its position, the State cites *State v. Reed*, 256 Kan. 547, 558, 886 P.2d 854 (1994). In *Reed*, this court upheld the trial court's admission of a photograph which depicted a decapitated head, finding that the photograph was a true representation of the victim's wounds, that it corroborated the pathologist's testimony as to the decapitation, and that it indicated the manner in which the victim's body was disposed of.

"The law is well settled in this state that, in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. [Citations omitted.]" *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990).

"The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. [Citations omitted.]" *State v. Mayberry*, 248 Kan. 369, 383, 807 P.2d 86 (1991).

"An abuse of discretion may be reached if the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. [Citation omitted.]" *Spears*, 246 Kan at 286.

Exhibit 32 showed Pearl White's body on the autopsy table, but the photograph was taken before any autopsy procedures had been

performed on the body. The body was cut in half, but this was because White had cut the body in half to help dispose of the body. The skin on the body was decaying, but this was because White buried the body so it was not discovered until several weeks after Pearl White was killed. The photograph was gruesome, but it depicted the body as it looked after this gruesome crime. See *State v. Harris*, 259 Kan. 689, 711, 915 P.2d 758 (1996) (holding that certain autopsy photographs of the victim's wounds were admissible because the photographs did not make the wounds look any more gruesome than they otherwise would have; the photographs accurately depicted the victim's injuries); *State v. Johnson*, 258 Kan. 475, 482, 905 P.2d 94 (1995) ("The photographs show a beaten and cut-up body, the condition of [the victim's] body when it was found. The pictures may be gruesome and shocking, but they depict what occurred. The trial court did not abuse its discretion in admitting into evidence the photographs taken at the scene."); *Reed*, 256 Kan. at 558 ("We have held that special care should be taken in admitting photographs taken after a pathologist has intervened in order that the evidence not be more gruesome than necessary. [Citation omitted.] The photographs admitted in this case show no marks made by [the pathologist]. Any marks on the body were essentially attributable to the defendant."). Exhibit 32 was properly admitted into evidence.

Exhibit 5 was also properly admitted into evidence. White claims the photograph is not an accurate depiction of how the body was buried. However, this is not what Officer Thebo purported it to be. Officer Thebo said the photograph was a depiction of the body as it was uncovered. The photograph corroborates Officer Thebo's testimony about how the body looked when it was uncovered. It may well be that the victim was buried all wrapped up in sheets, as White claims. Officer Thebo testified on direct examination that several sheets and blankets had to be removed from the proximity of the body in order to uncover it. Further, on cross-examination, White had the opportunity to question Officer Thebo about whether the body might have been buried all wrapped up in sheets. Even if the body was buried in this fashion, Exhibit 5 is still admissible as an accurate exhibit of how the body looked when it was

uncovered, as Officer Thebo purported it to be, not how the body looked when it was buried. Exhibit 5 is a true reproduction of a relevant physical fact material to the matters in issue. See *State v. Ruebke*, 240 Kan. 493, 516, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

Both photographs depict the manner in which White tried to dispose of the body. The photographs do not make this reality any more gruesome than it already was. The photographs corroborated the police officer's testimony of how the body was uncovered and the pathologist's testimony of how the body was cut in half. As discussed under Issue I, a defendant's actions after the victim's death are a factor to be used to determine if the defendant acted with premeditation. These photographs are relevant to White's actions after Pearl White's death, and, thus, are relevant to the issue of premeditation. These photographs were not repetitious, unduly gruesome, or without probative value. The probative value of these photographs is not outweighed by their prejudicial effect. Thus, the trial court did not abuse its discretion in admitting these photographs into evidence.

## III. CLOSING ARGUMENT

White takes issue with three different statements the prosecutor made during closing argument. The first statement related to White's testimony in which he stated that his mother came at him with a hammer, they struggled over it, and then she let go of the hammer, causing White to fall on the floor. At that time, according to White's testimony, White saw his mother reach into the closet and pull out a shotgun. The next thing White remembers, his mother was lying on the bed and there was blood all over. White also testified that after he buried his mother, he put the shotgun, knife, hammer, and pillows in a trash bag, which he deposited in a trash bin across the street.

In regard to White's testimony about the shotgun, the State asked Belinda's fiance, Michael Lewis, about the gun. On cross-examination, the defense counsel asked Lewis: "Do you know whether or not Miss Pearl White or Miss White [the grandmother] kept a weapon in the house?" Lewis answered: "I don't know any-

thing about that." The defense counsel then asked Lewis whether he ever saw a weapon while he was at the house, and he answered, "No." According to White, Lewis' testimony was not a refutation of his own testimony. Instead, Lewis, who was not a family member, simply testified that he did not know anything about there being a weapon in Pearl White's home.

However, in closing argument, the prosecutor stated: "In fact, the family of Pearl White testified and Mr. Lorton [defense counsel] went to extreme cause to ask them if Pearl White had a shotgun, did you ever see a shotgun in the house. There was never ever—there was never ever evidence of a shotgun."

According to White, this is a flagrant misstatement of facts in evidence. White points out that Lewis is not a family member and that no one from his (White's) family gave any testimony regarding a shotgun or whether they had ever seen one in Pearl White's house. White claims that the prosecutor's false statement created an unjustifiable and prejudicial inference that in fact there was no shotgun in the house. Stating a fact in closing argument which is contrary to the evidence is improper. *State v. Chism*, 243 Kan. 484, 493, 759 P.2d 105 (1988). Thus, White asks this court to reverse his conviction and remand the case for a new trial, without the use of these improper remarks.

The second statement the prosecutor made in closing argument which White takes issue with relates to the trial testimony of Dillard McDaniel. McDaniel is the owner of a shop located near the White residence. McDaniel testified at trial that he emptied his trash one night after Pearl White disappeared. As McDaniel approached the trash receptacle, he smelled a foul odor. McDaniel thought that another man who also used the bin, whom he had previously argued with about the trash, threw some old meat in the bin after his refrigerator stopped working. When McDaniel opened the lid to the trash bin, he saw plastic grocery bags containing what he thought were bloody sheets. McDaniel also saw some other trash in the bin. McDaniel testified that when he saw the bloody sheets, he simply closed the lid of the trash bin, still thinking that the other man who used the bin had put spoiled meat in it. Once Pearl White's body was discovered, McDaniel suspected that White had

thrown the bloody bed sheets into his trash bin. However, the trash had already been picked up and it was impossible to verify this.

During closing argument, the prosecutor made the following comment in regard to McDaniel's trial testimony:

"[White] wants you to believe his mother came after him with a shotgun, a shotgun that there is no evidence of and he says, 'Well, I broke that shotgun down and I threw it away with the rest of the sheets.' Well, he wants to make up that little story, but apparently, he didn't take into consideration Dillard McDaniel, when Dillard McDaniel testified he told you he looked in there and he saw the bloody sheets. He saw them in these types of bags, these trash bags, which were the same type of bags that covered Pearl White's head. He didn't see any shotgun. He didn't see anything of that nature."

White claims that this statement is improper because it is contrary to evidence in the case. White concedes that McDaniel did not testify he saw a shotgun in the trash. However, White points out that McDaniel was never specifically asked if he saw a shotgun in the trash. According to White, the prosecutor's statement indicates that McDaniel looked at the trash carefully and did not see a shotgun. This statement is contrary to the facts in evidence, White argues, because McDaniel closed the trash bin lid right after he saw the bloody sheets. White contends that the prosecutor's statement about the shotgun created a prejudicial inference that there was not a shotgun in the trash, when such an inference is unjustifiable under the evidence presented. Stating a fact in closing argument which is contrary to the evidence is improper. *Chism*, 243 Kan. at 493. Thus, White asks this court to reverse his conviction and remand the case for a new trial, without the use of these improper remarks.

Finally, White takes issue with the prosecutor's statements in closing argument regarding the issue of premeditation. To establish the element of premeditation, there must be evidence that White planned, contrived, and schemed beforehand to kill his mother. See PIK Crim. 3d 56.04(b) (1994 Supp.).

However, in closing argument, the prosecutor made the following comments in an attempt to define premeditation:

"Ladies and gentlemen of the jury, this is murder in the first degree, premeditation. The defendant had the intent to kill his mother, Pearl White. He formed

that intent to kill Pearl White and he acted upon that intent. What evidence—what evidence is there of premeditation? Out of his own mouth he said that he was on the floor on his back with the hammer and she was across the room getting what he believed to be a gun out of the closet.

"The evidence will show in the light best suited for the defense that he got up with that hammer, went across the room and hit her in the back of the head. Her skull was in fragments and, ladies and gentlemen of the jury, we talked in voir dire about the issue of premeditation and we know again what we watch on television and in the movies, premeditation is not having to plan out the killing beforehand, it's not having to think hours, it's not having to think minutes, it's to form that thought, it's to form that intention and then act upon it and between the time this man got up off the floor with a hammer in his hand, went across the room and raised that hammer to the back of Pearl White, as the physical evidence shows, he had enough time to form the intent. He had enough time to premeditate this killing . . . .

. . . .

" . . . Premeditation, again, is not a plan, but it's . . . to form the thought to, the intent to kill the individual and act upon it. . . .

. . . .

"Ladies and gentlemen of the jury, I'm going to read part of the instructions, No. 7, and it says deliberately and with premeditation means to have thought over the matter beforehand. It doesn't say anything about a plan, it doesn't say anything about length of time and he wants to rest on the fact that Michael wasn't prepared to kill his mother because he didn't have the shovel. Ladies and gentlemen of the jury, use your common sense. Just because he didn't have the shovel doesn't mean he didn't have the premeditation, but, again, premeditation can be formed over a few seconds. If I form the intent to kill you and if I approach you and I act upon that intent that is premeditation and it doesn't have to take a minute or an hour or a week, it could happen within a few seconds and that's exactly what happened here. He formed that intent by getting up off the floor, going over to his mother when she had her back turned, took the hammer and smashed it in the back of her head."

White claims that the prosecutor's incorrect statements during closing argument improperly relieved the State of its burden to prove beyond a reasonable doubt that White acted with premeditation, an element of the charged crime of first-degree murder. Thus, White asserts that the prosecutor's uncured misstatements of fact and law in closing argument were so prejudicial to him that they must have affected the jurors to his detriment. White claims that his substantial rights were affected and that he was denied a fair trial. White asks this court to reverse his conviction and remand

the case for a new trial, without the use of these improper comments.

White never objected at trial to any statements made by the prosecutor during his closing argument. "The defendant cannot raise points on appeal which were not presented to the trial court." *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986). "Reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument if no contemporaneous objection is lodged." *State v. Synoracki*, 253 Kan. 59, Syl. ¶ 11, 853 P.2d 24 (1993).

White concedes that he did not object at trial to any of the prosecutor's statements made during closing argument, nor did he raise the issue in his motion for a new trial. However, White claims that the issue is not precluded on appeal for two reasons. First, White points to K.S.A. 1991 Supp. 21-4627(2), which is no longer in effect but applies to this case and places a duty on an appellate court to review the record for plain error in a hard 40 case, even if the defendant did not object to the error at trial. Second, White points to *State v. Wilson*, 188 Kan. 67, 73, 360 P.2d 1092 (1961), which provides:

" 'Where counsel refers to *pertinent facts not before the jury, or appeals to prejudices foreign to the case*, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion.' "

Based on these two sources, White contends that it is not always necessary for a defendant to object at trial to a prosecutor's improper statements in closing argument in order to challenge the improper statements on appeal. White asks this court to go ahead and address this issue despite his failure to raise it with the trial court.

In *State v. Collier*, 259 Kan. 346, 353, 913 P.2d 597 (1996), Collier argued on appeal that he was denied a fair trial because of improper remarks made by the prosecutor during closing argument. However, Collier conceded that he did not object to these remarks at trial. Nevertheless, this court considered Collier's com-

plaint for the first time on appeal based on K.S.A. 1993 Supp. 21-4627(2). For a hard 40 case which occurred before 1994, 21-4627(2) requires a court to "consider . . . *any* errors asserted in the review and appeal," even if the error has nothing to do with the sentence imposed. This is a hard 40 case which occurred before 1994; thus, this court will consider the alleged errors, even though White did not object to the prosecutor's remarks at trial and the remarks have nothing to do with the hard 40 sentence imposed.

In reviewing a prosecutor's challenged statements made during closing argument, *Collier*, 259 Kan. at 354, enunciates the proper standard of review:

"The analysis of the effect of a prosecutor's allegedly improper remarks is a two-step process. First the appellate court determines whether the remarks were outside of the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that '[i]n criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced.' *State v. Duke*, 256 Kan. 703, Syl. ¶ 5, 887 P.2d 110 (1994). We further held in *State v. Baker*, 219 Kan. 854, Syl. ¶ 9, 549 P.2d 911 (1976), that '[c]ounsel may appeal to the jury with all the power and persuasiveness his learning, skill and experience enable him to use.'

"The second portion of the analysis is that if the remarks are found to be improper, this court must consider whether in light of the record as a whole they are so prejudicial as to amount to reversible error. 'Each case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error.' *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

"The review which we make is governed by the following standard: 'Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial.' *Whitaker*, 255 Kan. 118, Syl. ¶ 7. 'In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt.' *State v. Gibbons*, 256 Kan. 951, Syl. ¶ 9, 889 P.2d 772 (1995)."

All of the prosecutor's challenged remarks may well constitute error because they were misstatements of fact or law. However, when viewed in the light of the trial record as a whole, as opposed to viewing each isolated incident by itself, the three comments

were not so gross and flagrant so as to deny White a fair trial. We find, beyond a reasonable doubt, that the errors had little, if any, likelihood of changing the result of the trial. Thus, the errors do not constitute reversible error, but simply qualify, at most, as harmless error.

As to the first challenged comment, the prosecutor misstated the facts when he said the *family* of Pearl White had been questioned about the shotgun. The prosecutor also misstated the facts when he said the defense counsel went to "extreme cause" to ask the family about the shotgun. The only person the defense counsel ever asked about the shotgun was Belinda's fiance, Michael Lewis. Further, the defense counsel only asked Lewis one question about the shotgun. This does not qualify as extreme cause. Thus, these comments clearly constituted misstatements of fact. However, the jurors heard the defense counsel question Lewis about the gun. They knew that the defense counsel only asked Lewis one question about the gun, which was not extreme cause. Further, Lewis testified that he was Belinda's fiance, so the jurors knew that Lewis was not a family member. Finally, the prosecutor only made these remarks in closing argument to back up his comment that there was no evidence of a shotgun in the house. This is a true statement of fact. Besides White's testimony, there was no other evidence of a shotgun in the house. Thus, the prosecutor's misstatements of fact about the gun, which were used to back up a true statement of fact, were not so gross or flagrant as to have had any likelihood of changing the result of the trial. At most, they constitute harmless error.

As to the second challenged comment, the prosecutor misstated the facts when he said McDaniel "didn't see any shotgun," implying that McDaniel had looked for a shotgun and had testified that he did not see one. In reality, McDaniel never testified about whether he saw a shotgun. The prosecutor simply asked him to explain what he saw in the trash bin and he did, never mentioning a shotgun. The jurors heard McDaniel's testimony. They knew he was never asked about whether he saw a shotgun. They knew he opened the trash bin, quickly looked inside, saw bloody sheets, and closed the bin. The prosecutor's misstatement of fact about

whether McDaniel saw a shotgun was not so gross or flagrant as to have any likelihood of changing the result of the trial.

Finally, as to the third challenged comment, the prosecutor misstated the law when he equated the term deliberation with intent. When read in its entirety, the prosecutor's comments simply indicate that White did not have to plan the killing for several hours in order for the element of premeditation to exist. Further, the trial court properly instructed the jury on the definition of premeditation, using PIK Crim. 3d 56.04(b) (1994 Supp.). See *State v. Banks*, 260 Kan. 918, 926-27, 927 P.2d 456 (1996) (prosecutor erred by improperly defining "reasonable doubt" in closing argument, but the trial court refused to grant a mistrial; this court affirmed the trial court because the comment, when read in its entirety along with accompanying language, conveyed the proper information and because the trial court instructed the jury on the proper definition of reasonable doubt). As such, all three of these alleged errors at most constitute harmless error beyond a reasonable doubt. This issue fails.

## IV. CUMULATIVE ERROR

White argues that the cumulative trial errors presented in this case require that his conviction be reversed and his case remanded for a new trial. In support of his argument, White cites to *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992), which provides:

"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."

White contends that cumulative error occurred in this case because the State inflamed the passions of the jury by introducing gruesome photographs and because the State misstated the law and facts in its closing argument. Further, White claims that the cumulative effect rule may apply in his case because the evidence of guilt is not overwhelming against him. The State does not respond to this argument.

There is no cumulative error here. The admission of the grue-some photographs was not in error. Some of the prosecutor's state-ments in closing argument were in error, but they only constituted harmless error. A few harmless errors do not create cumulative error so as to require a reversal of a conviction. This issue fails.

## V. MANDATORY NOTICE

White contends that the hard 40 sentence must be vacated due to the State's failure to comply with the mandatory notice provi-sions of K.S.A. 1993 Supp. 21-4624(1). This statute provides:

"If a defendant is charged with murder in the first degree, the county or district attorney shall file written notice if such attorney intends, upon conviction or ad-judication of guilt of the defendant, to request a separate sentencing proceeding to determine whether the defendant should be required to serve a mandatory term of imprisonment of 40 years ["hard 40 notice"]. *Such notice shall be filed with the court and served on the defendant or the defendant's attorney at the time of arraignment.* If such notice is not filed and served as required by this subsection, the county or district attorney may not request such a sentencing proceeding and the defendant, if convicted of murder in the first degree, shall be sentenced as otherwise provided by law, and no mandatory term of imprisonment shall be imposed hereunder." (Emphasis added.)

White did not have a formal arraignment, and there is no tran-script of his informal arraignment. However, based on the trial judge's handwritten notes on the criminal trial docket and other documents in the appellate record, it appears that the events sur-rounding White's informal arraignment are as follows: On July 30, 1992, White appeared in person and with his attorney, Philip Lor-ton. At this time, White waived preliminary hearing and was bound over for trial. White also waived a formal arraignment and pled not guilty to the crimes charged. A pretrial hearing was set for August 5, 1992, at 1:30 p.m. A notice to invoke mandatory prison term was served on White and his attorney.

On August 11, 1992, the State filed an original "Notice to Invoke Mandatory Term of Imprisonment" with the clerk of the Wyan-dotte County District Court by file-stamping. The computer entry in the criminal case history for the date of August 11, 1992, pro-vides: "NOTICE INVOK MANDATORY TERM IMPRISON FIL." This indicates that the State's notice to invoke a mandatory

term of imprisonment was filed on August 11, 1992. Nothing in the record refutes that the notice was in fact filed with the court on August 11, 1992.

This court has discussed the notice requirements of K.S.A. 1993 Supp. 21-4624(1) numerous times and has promulgated the following rules regarding the issue.

The notice requirements of K.S.A. 1993 Supp. 21-4624(1) are mandatory, and where the State fails to follow the requirements, the hard 40 sentence cannot be imposed. *State v. Clemons*, 261 Kan. 66, 71, 929 P.2d 749 (1996); *State v. Copridge*, 260 Kan. 19, 28-29, 918 P.2d 1247 (1996); *State v. Deavers*, 252 Kan. 149, 167-68, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). All hard 40 cases to which 21-4624(1) applies occurred prior to 1994. At this time, a hard 40 sentence was equivalent to the State's death penalty. Due to the severity of the penalty, the State is required to follow the hard 40 statutes exactly. Sloppy, incomplete records will not overcome the statutory notice mandates. If the State fails to file a notice with the trial court, as K.S.A. 1993 Supp. 21-4624(1) requires, and serve it on the defendant, then a hard 40 sentence cannot be imposed. *State v. Peckham*, 255 Kan. 310, 318, 875 P.2d 257 (1994).

Notice of intent to invoke a mandatory prison term must be filed with the district court after the defendant is bound over for arraignment and must be filed at the arraignment or before. Such notice may not be filed with the court after arraignment (*Copridge*, 260 Kan. at 29) or before the defendant is bound over for arraignment (*Peckham*, 255 Kan. at 315). Technically, notice of intent to invoke a mandatory prison term must be filed with the court before such notice may be served on the defendant at the arraignment. The filing of a notice with the court is a prerequisite to serving the defendant. *Peckham*, 255 Kan. at 316. However, if the notice is both filed with the court and served on the defendant at the arraignment, the court does not require these two events to occur in a lockstep order. *State v. Harris*, 259 Kan. 689, 708, 915 P.2d 758 (1996). The notice may be served on the defendant at the arraignment before the notice is filed with the court, as long as the notice

is actually and personally filed with the trial judge at the arraignment. *Clemons*, 261 Kan. at 73; *Harris*, 259 Kan. at 708-09.

A notice may be personally filed with the court at an arraignment. *Clemons*, 261 Kan. at 73; *Harris*, 259 Kan. at 709; *Peckham*, 255 Kan. at 316. See K.S.A. 60-205(e) ("The filing of pleadings and other papers with the court as required by this article shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with the judge, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk.").

In order to file a hard 40 notice personally with the trial court, the State must provide an original copy of the notice to the trial judge at the arraignment. 255 Kan. at 317. The State should indicate on the official record (transcript) that it is providing the judge with the notice not simply as a courtesy, but with the intent to file the notice pursuant to K.S.A. 60-205(e), as required by K.S.A. 1993 Supp. 21-4624(1). *Peckham*, 255 Kan. at 317. See *Harris*, 259 Kan. at 707-08 (the State indicated an intent to file a notice with the court, but the State cited the incorrect statute number; this court found the notice was still properly filed with the court). The judge must personally accept custody of the notice, preferably indicating on the record that such acceptance constitutes a filing of the notice with the trial court pursuant to K.S.A. 60-205(e), as required by K.S.A. 1993 Supp. 21-4624(1). *Peckham*, 255 Kan. at 318. See *Copridge*, 260 Kan. at 29-31 (the record did not contain an express statement from the trial judge that he was accepting custody of the notice, but the record demonstrates that the trial judge acknowledged receipt of "actual notice" and inquired about filling in the date of arraignment on the notice; this court found the trial judge intended to accept custody of notice for filing, and such filing did occur as required by K.S.A. 1993 Supp. 21-4624[1]); *State v. Williams*, 259 Kan. 432, 444, 913 P.2d 587, *cert. denied* 136 L. Ed. 2d 49 (1996) (if judge clearly accepts notice of filing, the judge does not have to expressly say on the record that the filing was accepted pursuant to 60-205[e] for the requirements of 21-4624[1] to be met).

Once the trial judge has personally accepted custody of the notice, filing of the notice with the court is complete. *Copridge*, 260 Kan. at 24; *Harris*, 259 Kan. at 709-10; *Williams*, 259 Kan. at 444; *Peckham*, 255 Kan. at 316-17 (citing *Tobin Constr. Co. v. Kemp*, 239 Kan. 430, Syl. ¶ 1, 721 P.2d 278 [1986]). If the record fails to properly record such a filing, the record may not be supplemented with unsworn statements by the prosecutor or the judge to prove a filing occurred, especially if the defendant was not permitted to question the accuracy of the statements. *Collier*, 259 Kan. at 365.

The trial judge should note on the notice the filing date and should forthwith transmit the notice to the office of the clerk. K.S.A. 60-205(e). However, if the trial judge personally accepts custody of the original notice but fails to note the filing date on the notice or forthwith transmit it to the office of the clerk, this does not nullify the filing of the notice. *Clemons*, 261 Kan. at 73; *Copridge*, 260 Kan. at 30; *Harris*, 259 Kan. at 709-10; *Williams*, 259 Kan. at 444; *Tobin*, 239 Kan. at 436 (comparing 60-205[e] to Fed. R. Civ. Proc. 5[e]).

Of all the cases addressing this hard 40 notice filing issue, *State v. Johnson*, 255 Kan. 140, 871 P.2d 1246 (1994), is the case which is the most factually similar to the one at hand. In *Johnson*, the defendant waived formal arraignment. Apparently the defendant's informal arraignment took place on February 27, 1992. The transcript of this proceeding provided:

" 'MR. HOFFMAN [prosecutor]: For the record, Your Honor, we wish to inform the defendant and the Court at this time that it is the State's intention to invoke the mandatory term of imprisonment—I think it's pursuant to statute 21-3401, K.S.A.—that should the defendant be found guilty by a jury of premeditated murder, he is subject to the sentencing of a mandatory term of forty years imprisonment without parole.

" 'THE COURT: Very well. And you'll supply him with written notice of that?

" 'MR. HOFFMAN: Your Honor, I'll supply him with that immediately.

" 'MR. LONG: Do you have a copy—I need a copy of—' " 255 Kan. at 154.

On the docket sheet in the *Johnson* case, there were several entries for the date of February 27, 1992, which provided:

" '2/27/92 Count II amended orally, amended information to be filed to include "sum of money[.]"

" 'Record should reflect State intention to request mandatory 40 yr sent. if convicted on Count I.

" 'The court finds a crime has been committed as charged and there is probable cause to believe deft. guilty thereof. Deft. bound over for trial, deft. waives formal arraignment and pleads not guilty. Bond set $200,000. Pre-trial conference set 3-4-92 2:30 p.m. [Signed] Michael G. Moroney. Judge' " 255 Kan. at 153.

The *Johnson* court stated: "A fair reading of the entry on the docket sheet requires the conclusion that written notice was not submitted to the judge during the courtroom proceeding on February 27, 1992." 255 Kan. at 153.

Thus, this court held that, based on the record before it, the State did not serve or file the original hard 40 notice with the trial judge at the time of or before the informal arraignment on February 27, 1992. 255 Kan. at 155. This court held that the State did not file a hard 40 notice with the court until the notice was file-stamped by the clerk's office on July 31, 1992, 155 days after the informal arraignment. Since the State did not fulfill the mandatory notice filing requirements of K.S.A. 1993 Supp. 21-4624(1), this court vacated the hard 40 sentence imposed under the statute and remanded the case for resentencing as otherwise allowed under law. 255 Kan. at 155.

The case at hand is very similar to the *Johnson* case. In this case, White waived formal arraignment. White's informal arraignment took place on July 30, 1992. There is no transcript of this proceeding. However, the trial judge's handwritten notes on the docket include an entry for this date, which provides: "Notice of State's intent to invoke K.S.A. 21-4624 served upon both [defendant] and [defendant's] counsel." The trial judge initialed these comments. The next entry on the criminal trial docket form refers to the pre-trial conference on August 5, 1992.

The State's notice of intent to invoke the hard 40 sentence was not file-stamped until August 11, 1992, 12 days after the informal arraignment occurred. A fair reading of the trial judge's notes and the computer entry indicate that the State only served the hard 40 notice on White and his attorney. There is not any indication that the State provided or filed with the trial judge an original (or copy for that matter) of the hard 40 notice at the time of the informal

arraignment. Further, the original notice which was file-stamped on August 11, 1992, shows no indication that it was handed to the judge on July 30, 1992. The certificate of service for the notice is entitled "Certificate of Mailing," and the State claims it personally served the notice on the judge on July 30, 1992, but the date line in the certificate of service is left blank.

From the record this court has before it, none of the requirements to effectuate filing with the court occurred at the time of the informal arraignment or before. We hold that the State did not file a notice of its intent to invoke a hard 40 sentence until the notice was file-stamped by the clerk's office on August 11, 1992, 12 days after the informal arraignment.

Pursuant to K.S.A. 1993 Supp. 21-4624(1), notice of intent to invoke a mandatory prison term must be filed with the district court at the arraignment or before. This did not occur here. The notice requirements of K.S.A. 1993 Supp. 21-4624(1) are mandatory, and where the State fails to follow the requirements, the hard 40 sentence cannot be imposed. Incomplete records cannot overcome the statutory mandates. Since the State did not fulfill the mandatory notice filing requirements of 21-4624(1), the hard 40 sentence imposed under the statute is vacated and the case is remanded to the trial court for resentencing as otherwise allowed under the law.

## VI. COMPETENCY HEARING PRIOR TO SENTENCING

K.S.A. 22-3302(1) states:

"At any time after the defendant has been charged with a crime and *before pronouncement of sentence*, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to *stand trial*. If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is *reason to believe* that the defendant is incompetent to stand trial the *proceedings shall be suspended and a hearing conducted to determine the competency* of the defendant." (Emphasis added.)

If the evidence raises a bona fide doubt as to the defendant's competency, then the failure to hold a hearing to determine competency is a denial of due process. *Pate v. Robinson*, 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966) (analyzing an Illinois statute).

After conviction but prior to sentencing, the trial court ordered White to undergo a presentence investigation at Larned State Security Hospital pursuant to K.S.A. 21-4603. The staff at Larned concluded that White had a psychotic disorder, was dangerous to himself because of his suicidal behavior, and was dangerous to others because of his drug and alcohol addiction. The staff recommended that White be committed to Larned for care and treatment in lieu of sentencing under the provisions of K.S.A. 22-3430. The Larned staff thought White should be sentenced for his crime only after he had been treated for his psychotic disorder.

At sentencing, the prosecutor noted the Larned report and recommendation, but said that he had talked to another psychologist at Larned who said that a second option for the court was to go ahead and sentence White and let him report to the Topeka Correctional Facility (TCF). The prosecutor stated: "[T]hrough [the TCF] evaluation he can go ahead then and be . . . sent to the State Security Hospital, thus, sentencing will be done and we will be done with him in Wyandotte County . . . and that's what we are asking this Court to do is to go ahead and sentence him." Defense counsel stated that he saw "no real difference" whether the court imposed sentence then or waited until some future date. In response, the district court stated:

> "Well, the Court was a little concerned after reading the report from Larned State Hospital indicating that they thought that he should be returned immediately there for some sort of treatment and I got the impression from reading that report that the doctor down at the Larned State Hospital didn't feel that the defendant was even ready for sentencing at this point, that they wanted him transferred back there and I suppose they were suggesting that we continue the sentencing until such time as they thought the defendant would be in a condition or state where he could more readily understand the sentencing I impose."

Defense counsel agreed that White needed treatment, and sending him to prison without it "would be almost like a death sentence." Nevertheless, the court stated that even if it did sentence White to prison, he would first go to TCF where an evaluation would be done, and that "he would probably end up back at Larned or some other institution for some sort of evaluation." Thus, the court stated that "there was no need to continue this matter for

sentencing," and the court imposed a hard 40 sentence. After his sentencing, TCF did evaluate White. It concluded that based on the "serious nature of the offense . . . incarceration [was] a necessity at [that] time." Although TCF felt White was "in need of mental health counseling," it still recommended White be incarcerated with the rest of the general prison population.

According to White, the Larned report raised a "reason to believe" that he was not competent to be sentenced. White contends that because the evidence raised a reason to believe he was incompetent prior to sentencing, the trial court was under an affirmative duty to suspend the sentencing proceedings and hold a hearing to determine whether White was competent to be sentenced. K.S.A. 22-3302. According to White, the trial court's failure to do so violated his right to due process of law. See *Pate v. Robinson*, 383 U.S. 375. Thus, White asks this court to set aside his hard 40 sentence.

This court has already vacated White's hard 40 sentence. Thus, this issue is moot as to the hard 40 sentence. Upon resentencing, the trial court will need to determine if evidence exists at the time of resentencing which raises a "reason to believe" that White is not competent to be resentenced. If the trial court finds such evidence exists at the time of the resentencing, the trial court "shall" hold a competency hearing. K.S.A. 22-3302.

The remaining issues challenging the hard 40 sentence are moot because the hard 40 sentence has already been vacated due to improper notice.

Conviction affirmed, sentence vacated, and case remanded with directions.

LOCKETT, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.