No. 88,084

STATE OF KANSAS, *Appellee,* v.
JEFFERY FRANK HEBERT, *Appellant.*
(82 P.3d 470)

Opinion filed January 16, 2004.

*Debra J. Wilson,* capital appellate defender, argued the cause and was on the briefs for appellant.

*John K. Bork,* assistant attorney general, argued the cause, and *Elizabeth L. Reimer,* assistant attorney general, *Stephen D. Maxwell,* assistant attorney general, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Jeffery F. Hebert was convicted of capital murder in violation of K.S.A. 21-3439, aggravated battery against a law enforcement officer in violation of K.S.A. 21-3415, criminal use of weapons in violation of K.S.A. 1999 Supp. 21-4201, and inflicting death to a police dog in violation of K.S.A. 1999 Supp. 21-4318. The jury was unable to reach a unanimous decision on a death sentence, and the court sentenced the defendant to consecutive sentences of life in prison without the possibility of parole for 50 years for capital murder, 46 months for aggravated battery against a law enforcement officer, 7 months for criminal use of weapons, and 12 months for inflicting death to a police dog. He appeals, raising numerous issues. We conclude that no reversible error occurred and affirm.

## Facts

Jeffery F. Hebert, while hiding from police in the attic of his residence, shot and killed Sheriff Deputy Jim Kenney, head of the Clay County K-9 unit, as Deputy Kenney climbed the attic stairs with his police dog named Copper, searching for the defendant. The defendant then shot the police dog two times with a .12-gauge shotgun, killing the dog. Deputy Kenney fell backwards down the stairs causing Sheriff Gary Caldwell to fall and injure his hand which required "three or four" stitches. In addition to the .12-gauge shotgun, the defendant possessed two other weapons, one of which was illegal to possess: a sawed-off .20-gauge shotgun. The defendant surrendered to the police after tear gas was shot into the attic.

The events leading to the death of Deputy Kenney began on November 12, 1999, when the defendant was arrested in Morganville on a probation violation from Cloud County. The defendant was transported from Morganville, in Clay County, to the Cloud County jail later that day. Three days later, on November 15, 1999, the defendant and two other inmates escaped from jail by subduing two deputy sheriff officers. Before trial, the defendant pled guilty to two counts of battery against a corrections officer and one count of aggravated escape from custody in connection with the escape. On the defendant's motion in limine, these convictions were excluded at trial based upon their prejudicial value outweighing the probative value of such convictions.

The defendant testified that after he escaped he originally intended to hide out and live in the woods. Soon after the escape, the defendant became separated from the other escapees and the plan began to fall apart. After many miles of walking and hitchhiking, the defendant returned to his house in Morganville during the early morning hours of November 16, 1999. He drank a couple of beers, packed a duffel bag full of clothes, and gathered his .12-gauge shotgun, his .22 caliber rifle, and his .20 gauge sawed-off shotgun. The defendant testified that he intended to use the guns to hunt animals in the woods for food. He explained that he always kept his guns loaded with the safeties off because he was the only one who handled them.

Around 7 a.m. the defendant called a friend, Buddy Butler, intending to ask for a ride, but changed his mind because he did not want to get Butler involved. Soon after calling Butler, the defendant fell asleep on his couch.

While the defendant was sleeping, Detective Kelly Kemp of the Clay County Sheriff's Department was gathering information from people who knew the defendant. Detective Kemp discovered the defendant's location when speaking with Butler, and he relayed this information to Sheriff Caldwell. Sheriff Caldwell instructed Detective Kemp to obtain a search warrant for the defendant's residence. While waiting for the search warrant, Sheriff Caldwell called the defendant's home telephone number three times and knocked on the defendant's door, but heard no response. Sheriff Caldwell called Deputy Kenney and asked him to come to the defendant's house with his police dog. Deputy Kenney and Copper arrived at the house around 2:30 p.m.

Meanwhile, inside the house, the defendant had just woken up. He finished packing his duffel bag and, according to the defendant, he was about to head outside to go live in the woods when he looked out the window and saw Sheriff Caldwell's vehicle parked outside. For reasons he is not able to explain, the defendant decided to take a shower. After getting out of the shower, the defendant again looked out the window, hoping one of the officers would move from their position long enough for him to escape.

At approximately 3:45 p.m., Detective Kemp arrived with the search warrant and a copy of the arrest warrant from Cloud County. Sheriff Caldwell positioned his officers in preparation for entering the house. Sheriff Caldwell knocked on the door and announced his presence. After waiting a couple of minutes and receiving no response, Detective Kemp forced open the back door. Sheriff Caldwell, Undersheriff Chuck Dunn, Detective Kemp, Deputy Kenney, and Copper entered the house.

When the defendant heard Sheriff Caldwell knocking, he gathered his three guns and went upstairs to the attic. The defendant still hoped to escape but saw a highway patrol officer was stationed outside near the window he planned to use in his escape. The

defendant sat in the corner of the darkened attic and laid his guns down on the floor.

When Sheriff Caldwell and his team finished conducting a sweep of the first floor, Deputy Kenney and Copper, followed by Sheriff Caldwell, headed up the stairs to the attic. Deputy Kenney stopped four or five steps from the top of the stairs and released Copper's leash, allowing him to search the attic.

The defendant saw Copper come into the attic and he grabbed his .12-gauge shotgun. Copper briefly walked around the attic but did not notice the defendant in the corner. Copper walked back to Deputy Kenney, who was hidden from the defendant's view. Deputy Kenney grabbed Copper and told him to lie down in a voice audible to the defendant. The defendant testified that he then saw one hand come into view to pet the top of the dog's head. When the defendant saw the bill of a cap and the end of what he thought was a gun come out from behind the corner, he raised his gun and fired. After the shot was fired, the dog began running toward the defendant. The defendant shot the dog once with his shotgun, but the dog continued to run toward him, so he shot him a second time and killed him.

The bullet fired at Deputy Kenney passed through a light switch and the plywood wall. The bullet and various smaller projectiles from the light switch and wall hit Deputy Kenney on the right side of his head, causing loss of consciousness immediately. The shot threw Deputy Kenney backwards into Sheriff Caldwell, causing both of them to fall down the stairs. The fall caused Sheriff Caldwell to suffer cuts to his nose and his hand, the latter requiring three to four stitches. Sheriff Caldwell dragged Deputy Kenney out to the back porch, where a first responder, Arnold Knoettgen, soon arrived and began treating him.

Sheriff Caldwell returned to the house and instructed Detective Kemp to shoot teargas rounds through the upstairs windows to force the defendant out. Four rounds of teargas were fired into the attic. Sheriff Caldwell and the other officers began yelling to the defendant, telling him that if he came down they would guarantee his safety. After a few minutes, the defendant walked down the steps and was arrested.

Deputy Kenney was still alive at this point but had shallow breathing and a weak pulse. Pam Kemp, Director of Emergency Medical Services at the Clay Center Hospital, soon arrived on the scene. Deputy Kenney was rushed to the emergency room where unsuccessful attempts were made to save his life. Dr. Timothy Penner pronounced Deputy Kenney dead at 4:50 p.m. The official cause of death was a shotgun injury to the head which caused "interruption of the brain" and loss of blood.

## (1) ADMISSION OF THE DEFENDANT'S STATEMENTS

On the evening of November 16, 1999, Special Agent Brad Cordts of the Kansas Bureau of Investigation (KBI) was sent to the Clay County Sheriff's Department in connection with the investigation of the murder of Officer Kenney. Agent Cordts arrived at the jail around 7:15 p.m. and his supervisor instructed him to transport the defendant to the Geary County Sheriff's Office to conduct an interview at the Junction City Police Department.

Agent Cordts met the defendant around 8:55 p.m. and the defendant declined to receive medical attention for his various scratches and abrasions. While driving to Junction City, the defendant asked if the officer had died and Agent Cordts replied that he was unsure. Around 9:45 p.m., the defendant was taken into an interview room with Agent Cordts and they sat down at a table. The interview was videotaped, and it began with the following relevant exchange:

"S.A. Cordts: Talk to you a little·bit and get both sides of the story. I've only heard one side of the story and, obviously, there's always two sides of a story here and I'd like in your words, your input and tell me what happened and explain in your words and coming from you. Would you like the opportunity to tell me your side of the story?

"Hebert: The officer and the dog came up the stairs and he stuck his head out there and I shot him.

"S.A. Cordts: Okay.

"Hebert: The dog came at me and I shot the dog.

"S.A. Cordts: Okay. Well, as you know, you've probably already seen it on T.V. a hundred times but, I need to read you your *Miranda* rights, which is your right to have that done and then I'll be glad to listen to anything you have to say and have you tell me in your own words what happened."

Agent Cordts asked the jailer to come in to remove the defendant's handcuffs and Agent Cordts read the defendant his *Miranda* rights and had him sign a waiver. Approximately 5 minutes after the defendant's first statement, Agent Cordts continued the interview by stating, "Now go ahead and tell me what you're talking about occurred at your house this afternoon." The defendant responded, "The dog came up the steps and went to the north end of the house. The officer stepped up there and I seen his gun and I fired. The dog came at me and I fired twice more. . . ." The defendant went on to make several incriminating statements throughout the 1 hour and 49 minute interview.

The defendant argues the district court erred by failing to suppress the videotape of his pre-and post-*Miranda* statements. On appeal, the defendant contends that his first confession was inadmissible because it was obtained during a custodial interrogation without a *Miranda* warning. He contends that his second post-*Miranda* statement made shortly thereafter was tainted by his earlier confession in the course of one continuous interview.

## Pre-*Miranda* Statements

The Fifth Amendment to the United States Constitution states that no person shall be compelled in any criminal case to be a witness against himself or herself, nor be deprived of life, liberty, or property, without due process of law. *State v. Lewis*, 258 Kan. 24, Syl. ¶ 1, 899 P.2d 1027 (1994). *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), holds that the State may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. *State v. Ewing*, 258 Kan. 398, Syl. ¶ 1, 904 P.2d 962 (1995).

*Miranda* warnings come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Dudley*, 264 Kan. 640, Syl. ¶ 1, 957 P.2d 445 (1998). An objective standard is used to judge whether an interrogation was custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. *State v. Valdez*, 266 Kan. 774, 791, 977 P.2d 242 (1999).

The defendant argues his pre-*Miranda* statement should have been suppressed because it was elicited by the functional equivalent of a custodial interrogation. There is no doubt in this case that the defendant was in custody when he was being interviewed by Agent Cordts in a private room at the jail. The defendant had been arrested, handcuffed, and chained, and was being transported from one jail to another at the time of the interview. Thus, the defendant's argument revolves around whether the initial pre-*Miranda* question constituted an interrogation.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Dudley*, 264 Kan. at 643 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 64 L. Ed. 2d 297, 100 S. Ct. 1682 [1980]).

The district court found the initial question was one in which a reasonable person would respond to in a yes or no fashion, and the question was not designed to elicit a confession but simply to make a determination of whether the officer and the defendant were going to have any further conversation.

The defendant takes issue with the district court's finding, arguing that other jurisdictions have held that the invitation to a suspect to tell his side of the story has been held to constitute an interrogation. However, most of the cases cited by the defendant are distinguishable from this case because they involved situations in which police officers initiated conversations with the defendants after they invoked their right to have counsel present. See *State v. Monroe*, 103 Idaho 129, 645 P.2d 363 (1982); *State v. Williams*, 6 Ohio St. 3d 281, 452 N.E.2d 1323 (1983); *State v. Crawford*, 73 Or. App. 53, 698 P.2d 40 (1985); *State v. Barmon*, 67 Or. App. 369, 679 P.2d 888 (1984). In the present case, the defendant never invoked his right to remain silent.

*State, City of St. Paul v. Lynch*, 477 N.W.2d 743 (Minn. App. 1991), is the most persuasive case cited by the defendant. In *Lynch*, the defendant was pulled over for a traffic violation by one officer but was recognized by another officer as the man she had seen earlier the same evening trying to pick up a prostitute. Upon seeing a known prostitute in the car with the defendant, and without giving a *Miranda* warning, the second officer said, "I thought you were going home," and then asked him, "what is your side of the story?" 477 N.W.2d at 745. The defendant confessed to engaging in prostitution and possessing marijuana. The Minnesota Court of Appeals held that the district court properly suppressed the defendant's confession because the defendant was in custody and the direct inquiry, which was not germane to the initial traffic stop, constituted an interrogation. 477 N.W.2d at 746.

In this case, Agent Cordts testified that he was shocked that the defendant responded with an incriminating statement. This court, however, is not concerned with the agent's subjective feelings, but whether he or she should have known his or her words were reasonably likely to elicit an incriminating response. *Dudley*, 264 Kan. at 643. A careful review of the agent's entire opening statement reveals that it was reasonable that the defendant would respond in the manner that he did.

Before asking, "Would you like the opportunity to tell me your side of the story," Agent Cordts told the defendant that he would like to hear his side of the story in his own words. This is exactly what the defendant did. The officer should have known that the defendant, who had made no previous statement, who knew he had shot the officer, and who had been in custody for several hours, might be anxious to take him up on this request to hear his side of the story. This question was not a routine booking question; rather, it was designed to gain information from the defendant about the shooting. The brief question as to whether the defendant wanted to tell his side of the story, preceeded by several requests by Agent Cordts that he wanted to hear the defendant's side of the story, elicited the defendant's confession while he was in custody. The interrogation should have begun with the administration of a *Miranda* warning.

The officer's failure to administer a *Miranda* warning to the defendant prior to his custodial interrogation creates the presumption of compulsion as to the defendant's initial confession. Consequently, the defendant's pre-*Miranda* statement should have been suppressed. *State v. Dang*, 267 Kan. 198, 205, 978 P.2d 277 (1999) However, the question remains as to whether the erroneous admission of the defendant's initial confession was harmless beyond a reasonable doubt. The answer to this question depends upon whether the defendant's nearly identical post-*Miranda* confession was admissible. See *State v. Lucas*, 243 Kan. 462, 476, 759 P.2d 90 (1988).

## Post-*Miranda* Statements

The defendant argues that his post-*Miranda* statements should also have been suppressed because they were tainted by his pre-*Miranda* confession made in the course of the same interview.

*Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), is the beginning point of our analysis of this issue. In that case, the defendant made an unwarned, incriminating statement while being arrested in his home. Approximately an hour later, the defendant was advised of his *Miranda* rights and provided a full written confession at the sheriff's headquarters. He subsequently sought to suppress his oral statement and signed confession, arguing that the initial statement "let the cat out of the bag" had tainted the subsequent confession as fruit of the poisonous tree under *Wong Sun v. U.S.*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). On appeal, the United States Supreme Court concluded:

"We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." 470 U.S. at 314.

*Elstad* thus applies in cases where there is no coercion or an attempt to undermine a suspect's ability to exercise free will. *State*

*v. McCorkendale*, 267 Kan. 263, 270, 979 P.2d 1279 (1999). In this case, the district court found that Agent Cordts' demeanor was not hostile, demeaning, offensive, or threatening, and review of the videotaped interview and the record supports this finding. Moreover, the defendant makes no claim on appeal that Agent Cordts' questioning was coercive, and a procedural violation of *Miranda* is only presumptively coercive rather than actually coercive. See *Dang*, 267 Kan. at 206 (quoting *U.S. v. Singleton*, 922 F. Supp. 1522, 1530-31 [D. Kan. 1996]). Absent coercion or improper tactics by the officers in obtaining the initial statements, there is no presumption of compulsion as to the subsequent post-*Miranda* statements. 267 Kan. at 205.

The defendant would have us distinguish *Elstad*, because his post-*Miranda* confession occurred in one continuous transaction that included his pre-*Miranda* confession, with no hour-long gap between the two as existed in *Elstad*. The defendant argues this case is more analogous to three cases cited below where the warned statement was suppressed because it was made in the course of one continuous transaction that included the unwarned statement.

In *Lewis*, the officers failed to give *Miranda* warnings and used deliberately coercive tactics during the first interrogation in an attempt to obtain incriminating statements from Lewis. Ten hours later, the officers continued to use improper tactics in a second interrogation until Lewis confessed. At that point, he was given a *Miranda* warning and confessed. This court reversed the district court's admission of the pre-and post-*Miranda* statements because the State failed to overcome the presumption of compulsion and because the police deliberately used coercive and improper tactics to obtain the incriminating statements. 258 Kan. at 37-38.

In *Miranda v. Arizona*, 384 U.S. at 494-96, local police officers interrogated defendant Westover over a 14-hour period without a warning of his rights. At the conclusion of the interrogation, Federal Bureau of Investigation (FBI) agents immediately began their own interrogation, administered a proper warning, and obtained written confessions within a few hours. The statements were admitted at trial.

The United States Supreme Court concluded that an intelligent waiver of the defendant's constitutional rights could not be assumed because the warning came at the end of the interrogation process in the defendant's point of view. The Court explained that the FBI interrogation was conducted immediately following the state interrogation, in the same police station, and in the same compelling surroundings. Thus, the federal authorities were the beneficiaries of the pressure applied by the state interrogation. The court suggested that "[a] different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." 384 U.S. at 496.

In *U.S. v. Carter*, 884 F.2d 368 (8th Cir. 1989), postal inspectors interviewed a bank employee in connection with the disappearance of various pieces of mail. Prior to receiving his *Miranda* warning, the defendant made incriminating statements and allowed the inspectors to search his wallet. The inspectors then administered his *Miranda* rights 55 minutes into the interview and the defendant provided a written confession. The district court suppressed the pre-*Miranda* statements and all evidence obtained. On appeal, the Eighth Circuit distinguished its case from *Elstad,* concluding that the second, warned confession was inadmissible:

"[T]here was no passage of time to speak of between the unwarned confession and the subsequent warnings and confession, all of which occurred as part and parcel of a continuous process. Thus, the second confession came almost directly on the heels of the first. Although *Elstad* precludes the formulation of a 'rigid rule' in determining the admissibility of the second confession, [citation omitted] our review of 'the surrounding circumstances and the entire course of police conduct with respect to the suspect,' [citation omitted] convinces us that the second confession cannot be allowed into evidence." 884 F.2d at 373.

*Lewis, Miranda,* and *Carter* present markedly different facts from the case we now review, as the statements admitted in each were obtained after a long period of unwarned interrogation in which the investigators were deliberately trying to obtain incriminating statements prior to giving the warnings. The circumstances in each of the three cases suggested corrosive police tactics. In the

present case, the pre-*Miranda* statement was made in response to the Agent's first question. Moreover, *Miranda* was decided prior to the Supreme Court's decision in *Elstad*. The three cases relied on by the defendant are dissimilar and not persuasive in resolving the question presented in this case.

The defendant is correct that the second confession in this case came shortly after the first unwarned confession. However, several cases have upheld the admission of the warned statement when it was made in the course of the same interrogation as the unwarned statement.

In *Dang*, 267 Kan. 198, officers interrogated the defendant for 35 minutes, determined that he was lying, administered the *Miranda* warning, and continued the interview. The district court suppressed the defendant's post-*Miranda* statements because they were the direct result of his pre-*Miranda* statements. On appeal, this court distinguished the case from its earlier decision in *Lewis* where the officers had used deliberatively coercive and improper tactics to obtain the initial statement. We reversed the district court, concluding that because the defendant's pre-and post-*Miranda* statements were not coerced or involuntary, his post-*Miranda* statements should have been admitted.

In *U.S. v. Esquilin*, 208 F.3d 315 (1st Cir. 2000), the defendant made several pre-*Miranda* and post-*Miranda* incriminating statements to officers while he was being arrested in his hotel room. As in this case, the defendant argued on appeal that his case was distinguishable from *Elstad* because his case involved only one interrogation. In analyzing *Elstad*, the First Circuit concluded: "[A]lthough the elapsed time between interrogations is one factor that may dissipate the taint of a coerced confession, the lesser taint of a *Miranda* violation may be dissipated by subsequent warnings even if the unwarned and warned statements are obtained during the same interrogation." 208 F.3d at 319.

In *U.S. v. Bermudez*, 2000 WL 1871676 (6th Cir. 2000) (unpublished opinion), the defendant made several incriminating pre-*Miranda* and post-*Miranda* statements during a 30-minute interview at the police station, broken up only by the officer leaving the room to speak with his supervisor. In addressing the district court's

concern that the reaffirmation of the earlier unwarned statements followed closely on the heels of the original statements, the Sixth Circuit adopted the reasoning of a Seventh Circuit case:

"[N]othing in the rationale of *Elstad* implies that the temporal proximity (or similarity) of the pre and post-*Miranda*-warning statements makes the latter any the less valid. Quite the contrary, we should think. A suspects willingness to make exactly the same statement a second time, following an advice of rights and a written waiver that drives home the seriousness of the steps about to be taken, demonstrates that the suspect is set on his course, and thus that the statement cannot be attributed to 'compulsion' in violation of the Constitution. *United States v. Gupta*, 183 F.3d 615, 618-19 (7th Cir. 1999)."

Finally, in *Davis v. U.S.*, 724 A.2d 1163, 1169 (D.C. 1998), the defendant cited *Carter* in arguing that he was subjected to one continuous period of custodial interrogation during which he was not informed of his rights until he had confessed to the crime. The defendant made a pre-*Miranda* statement, the officers left him alone for 15 minutes before giving the warnings, and his videotaped statement was made 11 minutes later. On appeal, the District of Columbia Court of Appeals declined to hold that what occurred was one continuous interrogation, thus requiring suppression of the post-*Miranda* statement, noting *Elstad*'s admonition that in circumstances involving the admissibility of a properly warned confession which follows an unwarned but clearly voluntary admission, a break between the two is not essential.

*Dang, Esquilin, Bermudez*, and *Davis* are analogous to this case. In these cases, the pre-*Miranda* statements were not obtained as the result of extensive interrogation, nor were they obtained in a coercive manner. Although these cases illustrate that a break in time between the first and second statement is not necessary, it is relevant to note that a brief break did occur between the statements in this case so that the defendant could have his handcuffs removed. Although the time between the first and second statement was admittedly brief (5 minutes), the defendant's decision to confess in response to the agent's very first question, and his subsequent post-*Miranda* confession shortly thereafter, clearly demonstrate his intent and desire to stay on course with his admission.

The weight of authority supports the application of *Elstad* in this case. We conclude that the district court, confirmed by the videotape of the entire interrogation, established that the defendant's statements were accompanied by no coercive police tactics. As such, the issue of admission of the post-*Miranda* statements rests solely upon whether they were knowingly and voluntarily made. See *McCorkendale*, 267 Kan. 263 at 270.

Voluntariness of a confession is determined from the totality of the circumstances, and where the district court conducts a full prehearing on the admissibility of extrajudicial statements by the accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts accept that determination if supported by substantial competent evidence and do not attempt to reweigh the evidence. 267 Kan. at 270-71.

Factors to be considered in determining whether a confession is voluntary include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; and (5) the fairness of the officers in conducting the investigation. 267 Kan. at 270.

There is no indication that the accused's mental condition was impaired when he made the post-*Miranda* statement. Although he complained of being hit on the head when he was arrested, he said he was not confused or injured and did not need to see a doctor. The agent acted in a professional, calm, and nonthreatening manner throughout the interview. The defendant's handcuffs were removed during the interview, and the entire interview lasted under 2 hours. Although he was informed of his right to have a lawyer present, the defendant never asked to communicate with his lawyer or anyone else during the interview. The defendant was 22 years old at the time of the interview, of normal intelligence, and had a criminal history. Nothing in the manner of questioning revealed an intent by the agent to trick or deceive the defendant into making a statement.

Nothing in these factors suggests that the defendant's post-*Miranda* statements were involuntary. As such, substantial competent

evidence supports the district court's admission of the post-*Miranda* statements at trial. See *State v. Makthepharak*, 276 Kan. 563, 78 P.3d 412 (2003). Our conclusion also renders the admission of the defendant's pre-*Miranda* statements harmless.

## (2) ADMISSION OF OFFICERS' CHANGED TESTIMONY

The defendant claims that he was prejudiced by the change in testimony by Sheriff Caldwell and Detective Kemp regarding whether or not Deputy Kenney had his gun drawn. The defendant's theory of defense was based on showing that the shooting was neither premeditated nor intentional but, rather, due to the panic of seeing Deputy Kenney's gun.

A. Standard of review

Appellate courts review the trial court's admission of evidence for abuse of discretion. *State v. Sims*, 262 Kan. 165, 170, 936 P.2d 779 (1997). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable or, in other words, when no reasonable person would have taken the position that was taken by the trial court. *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 804, 897 P.2d 123 (1995).

B. The trial court did not err in allowing the State to recall Sheriff Caldwell.

At the preliminary hearing, the following exchange between defense counsel and Sheriff Caldwell took place regarding the location of Deputy Kenney's gun at the time he ascended the stairs into the defendant's attic:

"Q. Jim had his gun out at the time?
"A. I can't answer that. I don't know.
"Q. Was he carrying a weapon himself?
"A. He was carrying a gun. I can't tell you if he had it drawn or not. He had the dog so he may not have had it out. I can't answer you, I don't know."

The question of whether Deputy Kenney had his gun drawn did not come up during Sheriff Caldwell's direct examination at trial on January 12, 2001, and the defendant now claims that he did not cross-examine Sheriff Caldwell at trial because nothing in his direct examination contradicted the testimony from his preliminary hear-

ing. Five days after he testified, Sheriff Caldwell approached the prosecutors and told them that he now remembered that Deputy Kenney had not drawn his weapon. Because the prosecutors did not know that Sheriff Caldwell would change his testimony, and because the State had not yet rested its case, the trial court on the State's motion allowed Sheriff Caldwell to testify that he remembered that Deputy Kenney had a flashlight, not a gun, in his hand.

The change in testimony opened the door for the defendant to attack the credibility of Sheriff Caldwell, but the defendant did not challenge the new testimony on cross-examination. On appeal, the defendant claims that this was done for strategic reasons. However, a party that invites error may not then complain of that error on appeal. *State v. Plunkett,* 261 Kan. 1024, 1033, 934 P.2d 113 (1997).

The defendant admits that at the time of Sheriff Caldwell's testimony, he was already "beginning to present [his] penalty phase defense as well." The defendant claims that Sheriff Caldwell was expected to testify during the penalty phase of the trial that a life sentence would "serve the interests of justice," and that, therefore, he was not in a position to attack Sheriff Caldwell's credibility. The State prosecutor told the defendant in chambers that he did not think that Sheriff Caldwell was going to testify the way the defendant expected. The issue became moot as the defendant did not question Sheriff Caldwell during the penalty phase.

Because a trial is a search for the truth, a court has discretion to allow a witness, who has had time to reflect, the opportunity to change or correct his or her testimony if done in good conscience. *State v. Gonzales,* 253 Kan. 22, 27, 853 P.2d 644 (1993). In *Gonzales,* this court held that there was no error in allowing the State to recall a detective three times to clear up inaccurate testimony and to testify about new information he remembered regarding the chain of custody of a murder weapon. The court commented on the fact that on each occasion, the defendant was given the opportunity to cross-examine the witness. 253 Kan. at 27. The defendant, in this case, was also given the opportunity to cross-examine Sheriff Caldwell. In the end, "the ultimate conclusion as to

any witness' veracity rests solely with the jury." *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000).

(C) Detective Kemp's contradictory testimony.

The defendant also argued that the trial court erred by allowing Detective Kemp to testify contrary to his police report. The defendant called Detective Kemp to testify during his case, and Detective Kemp acknowledged that he had written in his police report that he "observed Kenney draw his weapon and start up the stairs." On cross-examination by the State, Detective Kemp testified that his report was not accurate, and that upon further reflection, and after looking at the evidence custody receipt, he remembered that Deputy Kenney had not taken the gun off his belt. The defendant did not object to this testimony or question Detective Kemp about it but he did offer the police report into evidence.

Even if the alleged misconduct was not objected to at trial, the issue will be addressed if it rises to the level of a denial of due process. *Pabst*, 268 Kan. at 504. "Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial." 268 P.2d at 504.

For support, the defendant cites *State v. Lewis*, 238 Kan 94, 708 P.2d 196 (1985). In *Lewis*, this court reversed aggravated battery and aggravated robbery convictions when a KBI forensic examiner, who had written a report stating that a knife in the possession of one of the defendants did not have blood on it, unexpectedly testified at trial that the knife did in fact have blood on it. 238 Kan. at 95-96. The forensic examiner told the county attorney before testifying that her initial report had been wrong, but the county attorney failed to tell either the judge or defense counsel. 238 Kan. at 96. The court held:

"Prosecutorial misconduct occurs when the county attorney fails to disclose to both the trial judge and the defense counsel that he intends to introduce into evidence a report which he failed to inform the defense counsel had been corrected. If the corrected statement changes the theory of defense as presented to the jury in opening statement, then neither admonition nor instructions by the trial judge can cure the resulting prejudice." 238 Kan. at 99.

This case can be distinguished from *Lewis*. The court in *Lewis* stressed that the prosecutor's breach of duty was not his failure to disclose incriminating evidence. 238 Kan. at 98. Rather, the prosecutor's breach of duty was his failure to satisfy his statutory obligation under K.S.A. 22-3212(1)(b) (Ensley 1981), now K.S.A. 2002 Supp. 22-3212(a)(2), to allow the defendant "to inspect and copy the results of the scientific test or experiments made in connection with the particular case which are known, or by the exercise of due diligence may become known, to the prosecuting attorney." 238 Kan. at 98.

In this case, the State reached an agreement with the defendant to allow discovery of Detective Kemp's police report on May 26, 2000, well before trial. Had Detective Kemp revised his report, the State would have been required to deliver that report to the defendant under K.S.A. 22-3213(2), which states in part: "After a witness called by the state has testified on direct examination [at the preliminary hearing], the court shall, on motion of the defendant, order the prosecution to produce any statement (as hereinafter defined) of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified." Because Detective Kemp had never formally changed his report or told the State about his new recollection, there was nothing for the State to disclose.

The defendant concedes "there is no evidence that the State knowingly presented perjured testimony." Instead, he contends that the State knew the testimony was false after it was allowed to go uncorrected in violation of the Fourteenth Amendment to the United States Constitution. The defendant cites *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), in support of his argument.

In *Napue*, the defendant was charged with the murder of a police officer. George Hamer, who was Napue's accomplice in the murder, was the principal witness for the State. Hamer testified falsely that he had not received any consideration for his testimony, and the Assistant State's Attorney, who knew this was not true, did nothing to correct the perjured testimony. At a hearing held after

Napue's trial, the Assistant State's Attorney admitted to offering consideration to Hamer. 360 U.S. at 265-67.

There is no evidence in this case suggesting that the State knew that Detective Kemp's testimony was false. In fact, there is evidence supporting Kemp's contention that Kenney did not have his gun drawn. The evidence custody receipt which listed the items found on Deputy Kenney's person at the time of his death, included his Beretta .40-caliber handgun. Sheriff Caldwell also testified that as a former police dog handler, he knew that it was common procedure for a dog handler who has backup to leave his or her weapon in the holster.

The defendant's claim that the testimonies of Sheriff Caldwell and Detective Kemp were not reliable is not supported by the record. He points out that Sheriff Caldwell was released from his sequestration order and was allowed to watch the trial prior to being recalled by the State. The defendant, however, made no objection to Sheriff Caldwell's release from his sequestration order at trial. The defendant also claims that Sheriff Caldwell's testimony was not reliable because a flashlight was never listed as being recovered at the scene. The defendant claims that Detective Kemp's testimony is "disturbing" because he testified that his report was inaccurate after watching Sheriff Caldwell, his superior, change his testimony. With the exception of the flashlight, none of these contentions by the defendant are supported in the record, and they are based upon speculation and conjecture. Several officers were at the scene and the victim's flashlight could have been picked up or lost during the investigation at the scene. While there is some evidence that the flashlight's presence would have been noted, the defendant is merely speculating that because it is missing this establishes that the victim had his gun drawn.

All these contentions could have been brought up on cross-examination or closing argument, but are not appropriate considerations in this appeal. On appellate review, "conflicting evidence will not be weighed, and all questions of credibility are resolved in favor of the State." *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000). "[T]he ultimate conclusion as to any witness' veracity rests solely with the jury." *Pabst*, 268 Kan. at 507.

## (3) STATE'S COMMENTS IN CLOSING ARGUMENT

The defendant argued that his convictions should be reversed because the prosecutor committed misconduct in his closing arguments.

A. Standard of review

" 'Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial.' " *State v. Whitesell*, 270 Kan. 259, 284, 13 P.3d 887 (2000) (quoting *Pabst*, 268 Kan. at 504). An analysis of allegedly improper remarks by a prosecutor is a two-step process. First, a determination must be made as to whether the remarks are outside the considerable latitude granted a prosecutor in discussing the evidence. *State v. Lumley*, 266 Kan. 939, 959, 976 P.2d 486 (1999). Second, a determination must be made as to whether, based on the particular facts of the case and in light of the record as a whole, the remarks constitute harmless or prejudicial error. *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994). Prejudicial error occurs when the remarks are so gross and flagrant as to deny an accused the right to a fair trial. *Lumley*, 266 Kan. at 959.

B. The district court erred in failing to sustain an objection to the prosecutor's closing remark that premeditation "doesn't take any amount of time." However, the error was harmless beyond a reasonable doubt.

During the State's closing argument, the defendant objected to the following statement by the prosecutor: "He has to have thought over the matter beforehand and that doesn't take a long time, that doesn't take any amount of time." The defendant contends that the argument suggested that premeditation can occur in an instant. The State argues that the phrase "doesn't take any amount of time" is consistent with the phrase "no particular amount of time" that has been approved by this court. *State v. White*, 263 Kan. 283, 294, 950 P.2d 1316 (1997). This court has also approved the language "[t]here is no specific time element required to establish premeditation." *State v. Kingsley*, 252 Kan. 761, 771-72, 851 P.2d 370 (1993); *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988).

In *State v. Holmes*, 272 Kan. 491, 497, 33 P.3d 856 (2001), a lengthy discussion was held among the court and counsel concerning the definition of premeditation. It was apparent that the prosecutor understood Kansas law regarding the definition, as reflected in the discussion of Kansas case law and the district court's comments. Nevertheless, the prosecutor argued in closing that "premeditation can occur in an instant. That's the law in the State of Kansas." 272 Kan. at 497. Even though defendant failed to object, we concluded that the prosecutor "deliberately misstated the law to the jury, and the trial court's failure to act to correct the misstatement deprived Holmes of his right to a fair trial." 272 Kan. at 499-500. We reached this conclusion because it was clear from the discussion outside the presence of the jury that the prosecutor's remarks were a deliberate misstatement of the law and because the record contained little if any evidence of premeditation before Holmes shot the victim in a struggle over a gun. 272 Kan. at 492; see *State v. Doyle*, 272 Kan. 1157, 1165, 38 P.3d 650 (2002) (discussing *State v. Holmes*).

However, in *State v. Jamison*, 269 Kan. 564, 572, 7 P.3d 1204 (2000), we held that it was harmless error when the prosecutor stated in closing argument that "premeditation can occur in an instant." We noted that there is "a very real distinction between the argument of a prosecutor and the instruction of a trial court," emphasizing the fact that the jury had been given a proper instruction on premeditation and was told that arguments of counsel were not evidence. 269 Kan. at 573. We also pointed out that sufficient evidence was presented for the jury to have found premeditation. 269 Kan. at 573.

In *Doyle*, 272 Kan. at 1163, the prosecutor stated that "[s]omething can be premeditated as soon as it happens." We held that this was a misstatement of the law, but it was harmless because there was no indication that the misstatement was purposeful, the jury received a proper instruction on premeditation, and there was evidence of premeditation. 272 Kan. at 1165-66.

In *State v. Pabst*, 273 Kan. 658, 661, 44 P.3d 1230 (2002) (*Pabst II*), the prosecutor, when discussing premeditation, argued that "there's no amount of time that's required [for premeditation],"

similar to the prosecutor's comment in this case we now consider that premeditation "doesn't take any amount of time." In *Pabst II*, we warned prosecutors to avoid any phrases that were synonymous with in "an instant" and found the State's explanation to be a "dubious distinction," but did not find reversible error in the "no amount of time" remark. 273 Kan. at 661-63. We again pointed out that the jury had received the proper PIK instruction on premeditation, the jury had been told that arguments of counsel were not evidence, and there was evidence of premeditation. 273 Kan. at 663.

The prosecutor's remark in this case, as in *Pabst II*, falls very close to the disapproved "in an instant" language. Likewise, the prosecutor's remark on premeditation falls outside the considerable latitude given to prosecutors in closing argument. Yet, unlike *Holmes*, there is no evidence that the prosecutor's remark was a deliberate misstatement of the law. Also, unlike *Holmes*, there is overwhelming evidence of premeditation in this case.

Premeditation is a state of mind relating to a person's reasons and motives for acting as he or she did. *State v. Cravatt*, 267 Kan. 314, 328, 979 P.2d 679 (1999). Premeditation may be inferred from various circumstances, including: "(1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *White*, 263 Kan. at 294.

Examination of the circumstances in this case demonstrates that the defendant used the most powerful gun he owned, a .12 gauge shotgun loaded with the most powerful ammunition he owned, a slug round. No provocation was involved in this case, as Deputy Kenney was a law enforcement officer performing his legal duty to arrest the defendant. The defendant's actions before and after the killing also provide evidence of premeditation. He admitted to grabbing the guns on his way upstairs after seeing the officers outside his house and then seeing them come into his residence. All three guns were found loaded and ready to fire. The defendant admitted that he did not want to go back to jail and that he knew

the officers were coming to arrest him. After shooting Deputy Kenney, the defendant shot the police dog twice, and he did not give himself up until after tear gas rounds were fired into the attic. No threats or declarations were made by the defendant before or during the killing that would either support or refute any evidence of premeditation. Finally, no lethal blows were dealt after the victim's death, as he was killed with the one shot.

Appellate courts will not find reversible error when an objection to a prosecutor's statement has been sustained unless the statement was so prejudicial as to be incurable. *State v. Moncla*, 262 Kan. 58, 70, 963 P.2d 727 (1997) (citing *State v. Pioletti*, 246 Kan. 49, 67, 785 P.2d 963 [1990], and *State v. Pursley*, 238 Kan. 253, 265, 710 P.2d 1231 [1985]).

The misstatement in this case was not as prejudicial as in *Holmes* or *Jamison*. The jury was told that arguments of counsel were not evidence, and was given the proper PIK instruction, PIK Crim. 3d 56.04(b), curing any prejudice caused by the misstatement. There is no evidence that the prosecutor purposefully misstated the law. Finally, as in *Pabst II, Jamison,* and *Doyle,* there was sufficient evidence from which the jury could have found premeditation beyond a reasonable doubt. Under these circumstances, we conclude that the prosecutor's remark during closing argument was not so gross and flagrant as to deny the defendant his right to a fair trial. We further conclude that the error was harmless beyond a reasonable doubt because it had little, if any, likelihood of changing the result at trial. See *Lumley*, 266 Kan. at 959.

C. The trial court did not err in overruling the defendant's objection to the State's closing argument that compared a decision to shoot with premeditation.

The defendant next argued that the prosecutor confused intent with premeditation by arguing that the defendant's decision to pull the trigger could act as a basis for premeditation. The following argument by the prosecutor was objected to at trial: "Premeditation is defined for us. The instruction says it means to have thought the matter over beforehand. That doesn't require any particular interval of time between the thought and the murder. It merely requires

a *decision to act*, and in this case, *a decision to pull the trigger.*" (Emphasis added.)

Shortly thereafter, the prosecutor added: "And in this case the defendant thought that over and *made that decision*. He told us he did. Special Agent Brad Cordts asked him, so *your decision to shoot* was made as soon as you saw the gun, correct? And the defendant said 'yes.' " (Emphasis added.) No objection was raised to this statement. When the defendant's claimed error implicates his right to a fair trial and Fourteenth Amendment due process rights, the appellate standard of review is the same as if the remark was objected to. *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999).

The State contends that these statements, when read in the entirety of the closing argument, merely refer to the act of premeditation and not the physical act of murdering someone.

Although this court has never specifically approved of referring to the act of premeditation as a "decision," it has never held the use of such a phrase to be reversible error. In *State v. Wimbley*, 271 Kan. 843, 849, 26 P.3d 657 (2001), the prosecutor stated in closing argument: "Premeditation can occur in an instant. . . . I can decide to kill anybody in this room and that would be premeditation. That's what the law is." (Emphasis added.) Although in *Wimbley* we focused on the phrase "in an instant" and found it to be harmless error, we did not comment on the prosecutor's equating the formation of a decision to kill with premeditation. 271 Kan. at 850.

In this case, the prosecutor repeated the proper PIK definition several times and correctly stated the law on premeditation:

"When you determine whether the defendant premeditated this murder, we have to look at all of the circumstances, what attorneys like to call the totality of the circumstances. We look at what the defendant did both before and after the murder. We look at the victim's conduct. We look at the statements that the defendant made both before and after the murder, and we look at the weapon that the defendant used."

Considering the prosecutor's entire argument, especially the prosecutor's numerous references to the PIK definition of premeditation, we conclude that the phrase "[i]t merely requires a

decision to act, and in this case, a decision to pull the trigger" was not outside of the considerable latitude given to the prosecutor. See *Lumley*, 266 Kan. at 959.

## (4) PROPOSED PREMEDITATION INSTRUCTION

### A. Standard of review

The defendant requested an additional jury instruction and objected to its omission; therefore, the standard of review is "whether the instruction given properly and fairly stated the law as applied to the facts of the case and whether the instruction reasonably could have misled the jury." *Pabst II*, 273 Kan. at 666. "Jury instructions are to be considered together and read as a whole without isolating any one instruction." *State v. Walker*, 252 Kan. 279, 295, 845 P.2d 1 (1993).

Trial courts are not required to use PIK instructions, but it is strongly recommended because the instructions were developed in order to bring accuracy, clarity, and uniformity to jury instructions. Modifications or additions should only be made if the particular facts of a case require it. *Moncla*, 262 Kan. at 71.

### B. The PIK definition of premeditation has changed since this case was tried.

The trial court's jury instruction No. 6 on premeditation followed PIK Crim. 3d 56.04(b) (1994 Supp.) stating: "Premeditation means to have thought the matter over beforehand." The court denied the defendant's request to add the following sentence to the jury instruction on premeditation: "A defendant premeditates a crime when he forms a design or intent before the act; that is, when the defendant contrived, planned or schemed beforehand to murder the victim."

The defendant's proposed language originally comes from *State v. McGaffin*, 36 Kan. 315, 13 Pac. 560 (1887). The 1994 Supplement of PIK Crim. 3d 56.04(b), which was in effect at the time of the defendant's trial, cited *McGaffin* as authority but did not include the language in the actual definition.

The majority in *State v. Saleem*, 267 Kan. 100, 105, 977 P.2d 921 (1999), approved the 1994 PIK definition of premeditation and

found that the "language in *McGaffin* is only of historical interest." Justice Allegrucci concurred with the holding of *Saleem*, but disagreed with the majority on the PIK definition of premeditation. 267 Kan. at 115 (Allegrucci, J., concurring). Justice Allegrucci believed that by defining premeditation as "to have thought the matter over beforehand," the majority had "converted second-degree murder to first-degree murder." 267 Kan. at 115 (Allegrucci, J., concurring).

In *State v. Jamison*, 269 Kan. 564, 7 P.3d 1204 (2000), this court again approved the 1994 version of PIK Crim. 3d 56.04(b), stating that it "adequately conveys the concept that 'premeditation' means something more than the instantaneous, intentional act of taking another's life. To have thought the matter over beforehand means to form a design or intent to kill before the act." 269 Kan. at 573 (citing *McGaffin*, 36 Kan. at 319).

The 2001 Supplement of PIK Crim. 3d 56.04(b) included the *McGaffin* language in its revised definition of premeditation, stating: "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." PIK Crim. 3d 56.04(b) (2001 Supp.).

## C. The trial court did not err in rejecting the defendant's proposed jury instruction.

The claimed error pertaining to the jury instruction in this case is very similar to the error claimed in *Pabst II*. In *Pabst II*, the court held that the district court did not err in refusing to include an additional instruction stating: " 'Premeditation means something more than the instantaneous intentional act of taking another's life. To have thought the matter over beforehand means to form a design or intent to kill before the act.' " 273 Kan. at 659. This court again found that PIK Crim. 3d 56.04(b) (1994 Supp.) " 'adequately conveys the concept that "premeditation" means something more than the instantaneous, intentional act of taking another's life.' " 273 Kan. at 660 (quoting *Jamison*, 269 Kan. at

573). However, Justice Lockett joined Justice Allegrucci in his disapproval of any jury instruction based on the 1994 PIK definition of premeditation. 273 Kan. at 667. (Allegrucci and Lockett, JJ., concurring.)

This proposed instruction requested by the defendant in this case is also very similar to the one requested by the defendant in *Wimbley,* 271 Kan. at 849. In *Wimbley,* the trial court instructed the jury identically to the instruction in the present case, stating that " 'premeditation' means to have thought over the matter beforehand," but the defendant wanted to add the following: " 'Premeditation means that there was a design or intent before the act; that is, that the accused planned, contrived and schemed beforehand.' " 271 Kan. at 849. This court ruled that the trial court's instruction was a correct statement of Kansas law. 271 Kan. at 850.

This court has approved PIK Crim. 3d 56.04(b) (1994 Supp.) multiple times, most recently in *Jamison, Pabst II,* and *Wimbley.* While we approve of the changes in the definition of premeditation by the PIK Committee and urge trial courts to use the new PIK instruction on premeditation, we do not depart from our most recent decision approving the PIK Crim. 3d 56.04(b) (1994 Supp.) definition of premeditation. Thus, we conclude that the trial court in this case did not err in rejecting the defendant's proposed additional instruction.

## D. PIK Crim. 3d 56.04(b) (1994 Supp.) does not render the first-degree murder statute or the capital murder statute unconstitutionally vague.

The defendant also claims that PIK Crim. 3d 56.04(b) (1994 Supp.) renders the capital murder statute, K.S.A. 21-3439, and the first-degree murder statute, K.S.A. 21-3401(a), unconstitutionally vague in violation of the Fourteenth Amendment. The defendant cites *State v. Bryan,* 259 Kan. 143, 910 P.2d 212 (1996), as setting forth the proper standard of review:

" ' " 'The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there

is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the superior law is clear beyond substantial doubt.' " ' " *Bryan*, 259 Kan. at 145 (quoting *Moody v. Board of Shawnee County Comm'rs*, 237 Kan. 67, 74, 697 P.2d 1310 [1985]).

*Bryan* involved a direct challenge to the constitutionality of the Kansas stalking law, K.S.A. 21-3438, on grounds of vagueness. 259 Kan. at 144. In the present case, however, the defendant does not challenge the capital murder or first-degree murder statutes as being vague. Rather, he contends that they are rendered unconstitutionally vague when the PIK Crim. 3d 56.04(b) (1994 Supp.) instruction on premeditation is given. The defendant's argument implicitly assumes that had his requested expanded instruction been given, K.S.A. 21-3439 and K.S.A. 21-3401(a) would be constitutional.

This court has previously addressed a claim that a jury instruction on premeditation rendered K.S.A. 21-3401(a) unconstitutionally vague, in *State v. Groschang*, 272 Kan. 652, 36 P.3d 231 (2001). The jury instruction in *Groschang* added on to the PIK Crim. 3d 56.04(b) (1994 Supp.) instruction, stating: "Premeditation means to have thought over the matter beforehand for *any length of time* sufficient to form an intent to act." 272 Kan. at 668. (Emphasis added.)

The defendant in *Groschang* did not argue that the additional language caused the statute to be vague. Rather, he argued that the definition required even more language in order to prevent the statute from being vague. *Groschang* contended that the following language, essentially the same requested by the defendant in the present case, should have been added: "Premeditation means that there was a design or intent before the act, that is that the accused planned, contrived, or schemed [beforehand to kill]." 272 Kan. at 669.

We held in *Groschang* that the jury instruction did not render 21-3401(a) unconstitutionally vague under the facts of that case, as all of the evidence pointed to premeditation and there was no evidence of second-degree intentional murder. We noted that the jury had also found that "Groschang had the necessary mental ca-

pacity to form criminal intent to kill the victim," thus satisfying the requisite elements of 21-3401(a). 272 Kan. at 670.

In the present case, more than enough evidence was presented for the jury to find the defendant guilty of premeditated first-degree murder beyond a reasonable doubt. The defendant does not claim to have lacked the requisite mental capacity to form the necessary criminal intent. Having concluded in the numerous cases cited above that an instruction similar to the one given in this case was an appropriate statement of the law in Kansas, and for all of the reasons set forth above, we are able to conclude that the instruction given was not unconstitutionally vague.

E. The PIK instruction provides a principled means to distinguish death penalty from nondeath penalty cases and does not thwart the capital defendant's right to have a jury consider lesser included offenses.

Finally, the defendant argues that the PIK instruction fails to provide "a principled means . . . to distinguish those that received the death penalty and those that did not," citing *Maynard v. Cartwright*, 486 U.S. 356, 362, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988). He also argues that the PIK instruction thwarts the capital defendant's right to have the jury consider lesser included offenses, citing *Beck v. Alabama*, 447 U.S. 625, 627, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980). As this court has held that PIK Crim. 3d 56.04(b) (1994 Supp.) is an accurate statement of the law and the jury considered the lesser included offense of second-degree intentional murder, the defendant's arguments fail.

## (5) PRIOR CRIMES EVIDENCE

Before trial, the State filed notice of its intent to introduce evidence of some of the defendant's prior crimes. Specifically, the State sought to introduce evidence that the defendant was arrested for violating his probation and then committed the crimes of aggravated escape from custody and battery of two corrections officers. The State argued that these crimes were admissible under K.S.A. 60-455 to prove motive, opportunity, plan, intent, and

knowledge, and that they were also admissible independent of K.S.A. 60-455 as part of the res gestae of the crime.

The defendant filed a response to the State's motion, objecting to the introduction of the prior crimes under either theory. At a pretrial hearing, the court stated:

"Okay. My review of the pleadings filed in reference to this, and the cases cited, and review of the latest cases indicated that prior crimes, evidence of prior crimes and their admissibility have three requirements that must be met in order to introduce evidence under 60-455. Those are, as counsel is aware, evidence as relevant to prove one of the facts specified in the statute; or 2, the fact is a disputed material fact; and 3, that the probative value of the evidence outweighs its potential prejudice.

"I have carefully gone back over and looked at this, and the Court is of the opinion that the jury is entitled to know why the various law enforcement authorities were at Mr. Hebert's house. To not allow that would probably create a lot of speculation on the part of the jurors, and so I think that they are entitled to know that the Sheriff's Department was there to execute a valid arrest warrant which was issued out of Cloud County. I am not going to, however, allow the State to offer testimony as to why Mr. Hebert was in the Cloud County Jail and any details of the escape. It is the Court's opinion that even if such evidence were admissible under 445 or 448, to show motive, intent, or plan, that the potential prejudicial effect of such evidence far outweighs any probative value.

"As the Court recalls from arguments and pleadings, one of the arguments was that the State would want to show this, that Mr. Hebert's intent was to never return to jail, and therefore it was the motive for the murder. That is plausible, I suppose. The argument of the res gestae, the motive not to go back to jail, again, possible."

The court explained that the evidence of the battery of the corrections officers and the aggravated escape from Cloud County jail was not relevant in proving intent and would be more prejudicial than probative to proving preparation or plan. The court summed up its ruling, stating: "I will allow [the officers] to say that they had a valid arrest warrant issued out of Cloud County for his escape from the Cloud County Jail."

Defense counsel admitted to the jury during opening arguments that on November 11, 1999, the defendant had been arrested on a probation violation and it was not the first time the defendant had been arrested. Defense counsel did not, however, state what

the specific crimes were that led to the defendant's probation, or what the defendant had been arrested for prior to that.

At trial, the defendant objected to the introduction of the defendant's videotaped confession on the grounds that the tape had not been redacted to omit mention of defendant's prior crimes. During the confession, the defendant mentioned being arrested by Sheriff Caldwell on an aggravated battery charge, violating his parole, and escaping from jail. The court ruled:

"We all knew he was in Cloud County and that he escaped from the Cloud County Jail. If that's all it is, that it simply mentions the fact that he'd been arrested by Sheriff Caldwell and mentions the possibility of a crime for which he was arrested but does not talk about a conviction of that or necessarily a conviction about any other crime other than his PV in Cloud County, then I'm going to allow that to go forward. . . .

. . . .

"It strikes me is it goes to the veracity of his reason why he knew Sheriff Caldwell. I don't know how I can redact that out of there without completely taking out of context how he knew Sheriff Caldwell, and although it might have some prejudicial effect to the defendant, that, in my opinion, is not outweighed by the probative value which the statement has, especially in light of the fact that the jury is aware that Mr. Hebert has some prior criminal record or he would not have been in the Cloud County Jail. So based on the totality of the circumstances I'm going to go ahead and allow that over the objection of the defendant."

The videotape was then played for the jury. The defendant's specific complaint is in regards to the following portion of the confession:

"Q. How do you know Sheriff Caldwell? How do you know him by sight?
"A. He's the sheriff. Who doesn't know him?
"Q. Okay. So you've . . .
"A. Had contact with him before, yeah.
"Q. You've seen him and had previous contact several times?
"A. Mm-hmm.
"Q. And has he ever arrested you before?
"A. Shit, I'm sure he has for something.
"Q. You just can't think of a particular incident—possibly arrested you before?
"A. Yes. He and Kelly Kemp came and got me one day for something, but I don't know what it was for.
"Q. He and Kelly Kemp?
"A. Yeah.
"Q. Kelly Kemp is a sheriff's officer?

"A. Yeah, a cop of some kind—I don't know what he is.
"Q. Okay. And what were you arrested before on, Jeff? Why did they arrest you?
"A. I don't know what it was for that time. Shit I don't know. I think it was felony ag battery at that time.
"Q. Felony ag battery?
"A. Yeah, I think so.
"Q. You . . . The way you're saying this, Jeff, you say 'This time,' and so forth. It sounds like you've been arrested quite a bit in the past. I don't know this.
"A. Yeah, I've got a record.
"Q. You've got a record? You've been arrested quite a bit in the past? Ag battery was something you've been arrested for?
"A. The only time.
"Q. That was the only time—Okay. What other things have you been arrested for?
"A. DUI, DUI, minor in consumption, breaking a city park curfew—ah, shit, I don't know. Minor in possession, minor in consumption, I don't know shit. I don't know.
"Q. Okay, minor as far as drinking violations?
"A. Yes.
"Q. Okay."

Seven different prior crimes of the defendant were thus introduced into evidence: (1) aggravated battery, (2) DUI, (3) DUI, (4) possession of alcohol by a minor, (5) consumption of alcohol by a minor, (6) consumption of alcohol by a minor, and (7) breaking a city park curfew. Not all of the crimes the defendant admitted to are listed in his PSI report. Defense counsel stated that the aggravated battery charge was diverted but the details of the minor in possession and city park curfew violations are not known.

## A. Standard of review

The admission and exclusion of evidence lie within the sound discretion of the trial court. *State v. Lumley*, 266 Kan. 939, 953, 976 P.2d 486 (1999). Appellate courts review the trial court's admission of evidence for abuse of discretion. *State v. Sims*, 262 Kan. 165, 170, 936 P.2d 779 (1997). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, or in other words, when no reasonable person would have taken the position that was taken by the trial court. *Fusaro v. First Family Mtg. Corp.*, 257 Kan. 794, 804, 897 P.2d 123 (1995).

B. Admissibility of the defendant's prior arrest for aggravated battery

K.S.A. 60-407(f) states that "all relevant evidence is admissible." Relevant evidence is defined in K.S.A. 60-401(b) as "evidence having any tendency in reason to prove any material fact." A material fact is one that is "significant under the substantive law of the case and properly at issue." State v. Faulkner, 220 Kan. 153, 156, 551 P.2d 1247 (1976). Courts must also balance the probative value versus the prejudicial effect of the evidence. *State v. Saenz*, 271 Kan. 339, Syl. ¶ 5, 22 P.3d 151 (2001).

Review of the record indicates that the trial court was not admitting the evidence of the aggravated battery into evidence pursuant to K.S.A. 60-455. The trial court stated that the evidence went "to the veracity of his reason why he knew Sheriff Caldwell." The court then determined that the probative value outweighed the prejudicial effect, and stated that it was allowing the evidence in "based on the totality of the circumstances."

According to the defendant's own testimony, he first became aware of the law enforcement officers' presence at his house when he looked out his window and saw Sheriff Caldwell's Chevy Blazer. During his confession, the defendant stated that he saw Sheriff Caldwell outside of his house and immediately recognized him. Sheriff Caldwell also testified that he announced his presence by knocking on the door and yelling, "Clay County Sheriff's Department. We have a search warrant. Open the door." Although the defendant claimed that he did not hear Sheriff Caldwell yelling, he admitted to hearing the knocking, knowing that Sheriff Caldwell and the officers were coming into his house, and knowing that they were there to arrest him and take him back to jail. Therefore, the defendant's personal knowledge of Sheriff Caldwell tended to prove that the defendant knew when he pulled the trigger that he was shooting a law enforcement officer.

However, before the videotape was introduced, Sheriff Caldwell had already given a partial explanation of how he knew the defendant before the shooting:

"Q. Did you know [the defendant] before November 16th of 1999?

"A. Yes, I did.
"Q. Did he know you?
"A. Yes.
"Q. Now, what are you basing that answer on?
"A. Well, I've talked to Jeff a lot of times. I knew him when he was in high school.
"Q. Okay.
"A. We would see each other, we would visit, he would call me by name.
"Q. So he knew you fairly well?
"A. Well, yes.
"Q. I mean, he knew who you were?
"A. Yes."

This testimony offered a sufficient explanation of how the defendant knew that Sheriff Caldwell was one of the officers who was at his house to arrest him. The additional evidence of the prior arrest for aggravated battery, although relevant to the same issue, thus had little probative value and should have been excluded.

As the admission of the prior arrest for aggravated battery was erroneous, we must now determine whether the error was harmless.

"The admission or exclusion of relevant evidence in a criminal case is governed by two rules, the harmless error rule and the federal constitutional error rule. K.S.A. 60-261 sets out the harmless error rule. Error in the admission or exclusion of evidence by the court is not grounds for granting a new trial or setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. At every stage of the proceeding, the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. When reviewing the erroneous admission or exclusion of evidence, the error is harmless if no substantial right of the defendant is involved.

"Error in the admission or exclusion of evidence in violation of a constitutional or statutory right of a party is governed by the federal constitutional error rule. An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that the error is harmless. Before an appellate court may declare such an error harmless, the court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. Where the evidence of guilt is of such direct and overwhelming nature that it can be said that evidence erroneously admitted or excluded in violation of a constitutional or statutory right could not have affected the result of the trial, such admission or exclusion is harmless." *State v. Sanders*, 258 Kan. 409, 418-19, 904 P.2d 951 (1995).

K.S.A. 60-261 also encompasses the federal harmless error rule under Rule 52(a) of the Federal Rules of Criminal Procedure, which states: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *Holmes*, 272 Kan. at 498.

Applying the dual test, it is clear that the admission of the prior arrest for aggravated battery was not inconsistent with substantial justice, did not affect the substantial rights of the defendant, and had little, if any, likelihood of changing the results at trial. The evidence of guilt in this case was overwhelming. The defendant admitted to every element of all four crimes except for premeditation. As more than enough evidence was presented for this court to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the result at trial, the error was harmless.

C. The defendant's January 11, 1999, arrest for driving under the influence was admissible independent of K.S.A. 60-455, both as relevant evidence tending to prove premeditation and as part of the res gestae of the crime.

The videotaped interview also revealed the defendant's two prior crimes of DUI. For purposes of this section, the relevant DUI is the one that the defendant was convicted of on January 11, 1999. The defendant was convicted of both DUI and possession of marijuana on January 11, 1999, in Cloud County and was subsequently placed on probation. It is not clear from the record how the defendant violated the terms of his probation, but he was arrested for a probation violation on November 12, 1999, while in Clay County. The arrest for the probation violation is an integral part of the chain of events leading to the shooting on November 16, 1999. 1. The DUI charge was independently admissible as relevant evidence to prove premeditation.

The defendant admitted that he hid from police because he did not want to go back to jail. The defendant's prior arrest for DUI was relevant in showing his state of mind on the day of the murder. The defendant testified about how some jailers can "make things really rough" and complained that there was not much one could

do to pass the time while in jail. The defendant would have gotten at most a year in jail for his probation violation, but after only 3 days in custody, the defendant's dislike for confinement led him to escape. The defendant's arrest for DUI was relevant to show why he was determined not to return to jail, which tends to prove a premeditated intent to shoot any officer trying to arrest him and return him to jail. Therefore, it was not error to admit it into evidence.

2. Evidence of the defendant's prior crimes of driving under the influence was admissible as part of the res gestae of the crime.

"Res gestae deals with the admissibility of evidence of acts done as well as declarations made before, during, or after the occurrence of the principal event. These acts or declarations are admissible as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence. [Citation omitted.] Res gestae includes those circumstances or acts which are automatic and undesigned incidents of the particular litigated act and which may be separated from the particular act by lapse of time but are illustrative of that act. It is the whole of the transaction under investigation or being litigated. [Citation omitted.] These acts or declarations may be admissible as part of the res gestae to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. [Citation omitted.]

"Acts done or declarations made as part of the res gestae are not admitted into evidence without limitation but are governed by the procedural rules and rules of evidence set out in Article 4, chapter 60, of the Kansas Statutes Annotated. *State v. Clark*, 261 Kan. 460, 471, 931 P.2d 664 (1997)." *State v. Edwards*, 264 Kan. 177, 200, 955 P.2d 1276 (1998).

In *State v. McCowan*, 226 Kan. 752, 602 P.2d 1363, (1979) *cert. denied* 449 U.S. 844, the defendant shot and killed a police officer when the officer was attempting to arrest him for a parole violation on an unlawful possession of a firearm violation. The defendant's probation officer testified at trial about the defendant's previous conviction on the firearm charge. This court held that the probation officer's testimony was "relevant to show the circumstances surrounding the attempted arrest of the defendant for probation violation which led to the victim's death." 226 Kan. at 767.

In the present case, the DUI arrest is one step further removed but relevant to show the circumstances leading to the aggravated assault of Sheriff Caldwell and the murder of Deputy Kenney.

Although the videotape did not make clear that the defendant's probation was based in part on the DUI charge, defense counsel later elicited this information from the defendant during his direct examination:

"Q. Before I start talking about your time there, the charges that you were arrested on, what were they?
"A. A DUI and a misdemeanor possession of marijuana.
"Q. So at the time that you are being held in Cloud County you were on misdemeanors?
"A. Yes."

The defendant's convictions on January 11, 1999, of driving under the influence and possession of marijuana, was the first in a chain of events that led to the shooting on November 16, 1999. The conviction led to the defendant being placed on probation. The probation terms were violated, causing the defendant to be arrested. The defendant escaped from jail while being held due to the probation violation charge. Sheriff Caldwell and Deputy Kenney would not have been at the defendant's house were it not for his escape from jail. These facts show that the prior arrest that led to the probation violation was relevant as part of the res gestae to show why the police were at the defendant's house and to show the defendant's motive for the shooting.

D. The defendant's other prior crimes were admissible as relevant evidence, but had little probative value and thus should not have been admitted. However, the error was harmless.

The defendant's second DUI conviction, his two consumption of alcohol by a minor convictions, and his minor in possession and breaking a city park curfew arrests were also relevant in proving the defendant's state of mind regarding his desire not to be arrested and returned to jail. However, there was little additional probative value in admitting offenses compared with the DUI that led to the probation violation. There was a risk that the jury would view these offenses merely as an indication of the defendant's propensity to commit crimes, however forbidden by K.S.A. 60-455. Therefore, the trial court erred in admitting these offenses.

However, in applying the dual test for harmless error, the admission of the evidence of these prior crimes and arrests was not inconsistent with substantial justice, did not affect the substantial rights of the defendant, and had little, if any, likelihood of changing the results at trial. Their admission was, therefore, harmless error.

## (6) ADMISSION OF PRE-DEATH PHOTOGRAPH

The defendant claims that the 8 X 10 black and white photograph of Deputy Kenney in his uniform admitted into evidence was irrelevant and inflammatory.

### A. Standard of review

"The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion." *State v. Walker*, 252 Kan. 279, 287, 845 P.2d 1 (1992).

### B. Admission of the photograph was not error.

The defendant filed a pretrial motion to bar any pre-death photographs of Deputy Kenney and offered to stipulate as to Deputy Kenney's identity. The State did not accept the stipulation because it had not yet decided whether to offer a pre-death photograph into evidence. The trial court advised the State to inform the court if it decided to agree to a stipulation and that the court would rule on the defendant's motion at that time. After the jury was selected, but before any witnesses were called, the State moved to admit a professional 8 X 10 black and white photograph of Deputy Kenney in his uniform, stating:

"We would admit it for several purposes: First of all for identification, it shows who he is and shows that that is the person on whom the autopsy was performed. We would be asking the Sheriff to identify this and we would then be asking Dr. Mitchell about it. It also shows him—you know, it is additional evidence that he was a law enforcement officer; that's also an element that we have to prove."

The trial court admitted the photograph into evidence. During Sheriff Caldwell's direct examination, the State had Sheriff Caldwell look at the photograph. Sheriff Caldwell identified the man in the photograph as Deputy Kenney, and the State then offered the

exhibit into evidence. The defendant did not object and the photograph was admitted into evidence.

The defendant now contends that the photograph was irrelevant because Deputy Kenney's identity was not in issue due to the pretrial offer to stipulate. With few exceptions, "[i]t is an established rule of law that an admission by a defendant does not prevent the state from presenting separate and independent proof of the fact admitted." *State v. Johnson*, 216 Kan. 445, 448, 532 P.2d 1325 (1975).

In *State v. Gholston*, 272 Kan. 601, 613, 35 P.3d 868 (2001), this court held that "[e]ven where the defendant concedes the cause of death, the prosecutor has the burden to prove all the elements of the crime charged and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible." In this case, the State had the burden of proving Deputy Kenney's identity and that he was a law enforcement officer. The pre-death photograph of Deputy Kenney in his uniform was relevant for these purposes.

In *Walker*, this court found no error in allowing into evidence a pre-death transparency photograph of the victim along with crime scene photographs, which were displayed during trial and closing argument. We reasoned that "[t]he photographs showed what the victim's killers did to her. The victim was stomped to death with resultant massive injuries, especially to the head and neck areas. The studio photograph taken in life shows how the victim appeared before the attack rendered her virtually unrecognizable." *Walker*, 252 Kan. at 287. As in *Walker*, the picture was relevant in this case because, the "studio photograph taken in life shows how the victim appeared before the attack." 252 Kan. at 287.

The defendant cites three Kansas cases for support: *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998); *State v. Henry*, 273 Kan. 608, 44 P.3d 466 (2002); *State v. Carter*, 270 Kan. 426, 14 P.3d 1138 (2000). All three can be distinguished from the present case.

*Donesay*, like the present case, involved the murder of a police officer in which premeditation was the main issue. However, *Donesay* involved the admission of irrelevant and prejudicial testimony from the victim's widow relating to how "happy," "inspira-

tional," and "well-respected" her husband was, even going as far as to discuss their last kiss. 265 Kan. at 83-84. We held that the testimony was "irrelevant, prejudicial and inflammatory" because it was "not relevant to any material fact charged." 265 Kan. at 84-85.

In *Henry*, a murder victim's mother testified about her daughter's good character and relationship with her family. Because the only issue in dispute was whether the defendant's mental defect prevented him from forming the requisite intent for intentional murder, this court held that having the mother testify about irrelevant details of the victim's life constituted both reversible error and prosecutorial misconduct.

*Carter* involved the admission of irrelevant and inflammatory testimony, this time from the murder victim's father. This court reversed the defendant's conviction on other grounds but noted error in the admission of the testimony so that it would not be repeated on retrial. The State had conceded that other testimony established the victim's identity and death. Referring to the *Donesay* decision, we held that the father's testimony only served to "inflame the jury against the defendant." 270 Kan. at 442.

The admission of the photograph of Deputy Kenney was not inflammatory or irrelevant such as the testimony given in *Henry*, *Donesay*, and *Carter*. A big difference exists between admitting a professional black and white photograph and allowing family members to testify about personal details regarding a murder victim. The photograph admitted in this case was not commented on by any witnesses other than Sheriff Caldwell and he identified Deputy Kenney, described his professional background, and testified about how they came to work with each other in the Sheriff's Department.

The defendant also cites three cases from other jurisdictions that have held the admission of pre-death photographs to be in error. These cases are not persuasive.

In *People v. Dansa*, 172 App. Div. 1011, 1012, 569 N.Y.S.2d 535 (1991), the admission of a pre-death photograph of a murder victim "offered only as an accurate representation of the appearance of the victim at some undetermined time prior to the crime" was held

to be error, but it was harmless error due to the overwhelming evidence against the defendant.

In both *White v. State,* 674 P.2d 31, 36 (Okla. Crim. 1983), and *Binsz v. State,* 675 P.2d 448, 451, (Okla. Crim. 1984), the court reversed murder convictions on other grounds but noted error in the admission of pre-death photographs so that they would not be admitted on retrial.

However, the Oklahoma Court of Criminal Appeals took a stricter view against the admission of pre-death photographs in *Ritchie v. State,* 632 P.2d 1244, 1246 (Okla. Crim. 1981), in which pre-death photographs of a murdered child were displayed, in which the court stated that "[t]he jury should not have been concerned with what the child looked like prior to the offense committed against her." This is far different than this court's holding in *Walker* that the jury had a right to know "how the victim appeared before the attack rendered her virtually unrecognizable." 252 Kan. at 287. However, even with a stricter view, the Oklahoma Court of Criminal Appeals has held that if the evidence against the defendant is overwhelming, the erroneous admission of a pre-death photograph may be harmless error. *Boutwell v. State,* 659 P.2d 322, 326 (Okla. Crim. 1983); *Valdez v. State,* 900 P.2d 363, 381, (Okla. Crim. 1995).

The photograph of Deputy Kenney in his uniform was relevant to prove identity and that he was a law enforcement officer, both of which were elements that the prosecution had to prove beyond a reasonable doubt. The photograph was displayed one time early in the trial and was not accompanied by inflammatory personal details about Deputy Kenney. Therefore, it was not error to admit the photograph into evidence.

## (7) JURY INSTRUCTION ON CERTAIN LESSER INCLUDED OFFENSES

The defendant argues that the trial court erred by failing to instruct the jury on certain lesser included offenses. The defense requested instructions on second-degree unintentional murder (K.S.A. 1999 Supp. 21-3402(b); PIK Crim. 3d 56.03-A), involuntary manslaughter (K.S.A. 1999 Supp. 21-3404; PIK Crim. 3d 56.06),

and reckless aggravated battery against a law enforcement officer (K.S.A. 21-3415(b)(2); K.S.A. 21-3414(a)(2)(B); PIK Crim. 3d 56.19). Although these requests were denied, the court did instruct the jury on the lesser included offenses of second-degree intentional murder (K.S.A. 1999 Supp. 21-3402(a); PIK Crim. 3d 56.03) and battery against a law enforcement officer (K.S.A. 1999 Supp. 21-3413; PIK Crim. 3d 56.17).

## A. Standard of review

The trial court has a duty to instruct the jury on lesser included offenses. *State v. Kleypas,* 272 Kan. 894, 942, 40 P.3d 139 (2001).

The duty to instruct arises only where the record shows evidence upon which the accused might reasonably be convicted of the lesser offense. *State v. Pierce,* 260 Kan. 859, 865, 927 P.2d 929 (1996). In *State v. Harris,* 259 Kan. 689, 702, 915 P.2d 758 (1996), this court set forth the evidentiary standard to be followed in determining whether the trial court was required to instruct on a lesser included offense.

"We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense."

Whether a crime is a lesser included offense is a question of law over which this court has unlimited review. *State v. Belcher,* 269 Kan. 2, 4, 4 P.3d 1137 (2000).

## B. The trial court did not err in failing to instruct on second-degree unintentional murder.

This court has held that the legislature intended second-degree unintentional murder, also known as depraved heart murder, to be a lesser included offense of first-degree murder. *Pierce,* 260 Kan. at 864-65. Second-degree unintentional murder is defined in K.S.A. 1999 Supp. 21-3402(b) as "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life."

"Instructions on lesser included offenses must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant." *State v. Dixon*, 248 Kan. 776, 781, 811 P.2d 1153 (1991). During his confession, the defendant did tell Agent Cordts: "I didn't mean to kill him . . . I just wanted to get him the hell away from me." However, during trial, on redirect examination the following exchange took place:

"Q. Did you admit to intentionally killing the police officer back in November of 1999?
"A. I said I shot the gun, yes.
"Q. Are you here to take responsibility for what you did do?
"A. Yes.
"Q. For intentionally killing a police officer?
"A. Yes."

Later, in redirect, the following admission was also made by the defendant:

"Q. Did you make a choice to pick up the gun and fire?"
"A. Yes."

The evidence, when viewed in the light most favorable to the defendant, does not justify a verdict of second-degree unintentional murder. The defendant's own admission at trial that he intentionally shot Deputy Kenney excludes any theory of guilt that the murder was unintentional but reckless. The trial court did not err in rejecting the defendant's proposed instruction of second-degree unintentional murder.

C. The trial court did not commit error in rejecting the defendant's proposed instructions on involuntary manslaughter and reckless aggravated battery.

Involuntary manslaughter is the "unintentional killing of a human being committed . . . [r]ecklessly." K.S.A. 1999 Supp. 21-3404(a). The evidence, even when viewed in the light most favorable to the defendant, does not justify a verdict of involuntary manslaughter. The defendant's own admission at trial that he intentionally shot Deputy Kenney excludes any theory of guilt that the murder was unintentional but reckless. The trial court did not

err in rejecting the defendant's proposed instruction on involuntary manslaughter.

Reckless aggravated battery of a law enforcement officer is "recklessly causing bodily harm to [a law enforcement officer] with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 21-3414(a)(2)(B); K.S.A. 21-3415(b)(2). "Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." K.S.A. 21-3201(c).

The defendant knew that there was more than one officer in his house and that one was Sheriff Caldwell. The defendant knew the officers would have to come up the stairs to get into the attic and any officer that he hit could fall down the stairs onto the other officers. For these reasons, and because the trial court properly instructed the jury on the lesser included offense of battery of a law enforcement officer, it was not error to refuse to instruct the jury on reckless aggravated battery of a law enforcement officer.

## (8) CUMULATIVE ERROR

### A. Standard of review

"Cumulative trial errors may require reversal of a defendant's conviction if the totality of the circumstances substantially prejudiced the defendant and denied him a fair trial." *State v. Whitesell*, 270 Kan. 259, 292, 13 P.3d 887 (2000). "No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." 270 Kan. at 292. The three errors relating to admission of his pre-*Miranda* confession, the trial court's failure to sustain defendant's objection to the prosecutor's comments concerning premeditation, and the admission of defendant's previous arrests for aggravated battery and other minor offenses were determined to be harmless beyond a reasonable doubt. Moreover, the evidence against the defendant was overwhelming. The record before us provides no basis for the claim of cumulative error.

## (9) **HARD 50 SENTENCING**

After the defendant was found guilty on all counts, he waived his right to contest a sentence below the statutory maximum and stipulated to the aggravating factors for the purposes of a hard 50 sentence. The jury was unable to reach a unanimous decision in the sentencing phase of the trial. The trial court found that the defendant "knowingly created a great risk of death to more than one person" and that the defendant "committed the crime in order to avoid or prevent a lawful arrest." See K.S.A. 1999 Supp. 21-4636(b), (e). Based on these aggravating circumstances, the trial court sentenced the defendant to life in prison without the possibility of parole for 50 years on the capital murder charge.

### A. Standard of review

The defendant did not raise the issue of the constitutionality of the Kansas hard 50 statute, K.S.A. 21-4635 *et seq.*, at trial but urges this court to consider his claim under *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967), in which this court held that it would review constitutional claims not raised at trial if (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case, (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights, and (3) the district court is right for the wrong reason.

### B. The Kansas hard 50 sentencing procedure is constitutional.

The defendant claims that K.S.A. 21-4635 *et seq.* is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The defendant contends that the aggravating factors that increased his sentence from life without the possibility of parole for 25 years to life without the possibility of parole for 50 years are facts that should have been found by a jury beyond a reasonable doubt.

In *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), this court upheld the Kansas hard 40 sentencing procedure. The court found that it was consistent with *McMillan v. Pennsylvania*, 477 U.S. 79, 83, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), which held that a sentencing factor which established a 5-year minimum sentence for felons who visibly possessed a firearm during the commission of the offense was constitutional because it "neither provides for an increase in the maximum sentence for such felony nor authorizes a separate sentence."

In *State v. Douglas*, 274 Kan. 96, 111 (2002), *cert. denied* 537 U.S. 1198 (2003), this court relied on its decision in *Conley* holding that the Kansas hard 50 sentencing scheme is constitutional. We reached the same result in *State v. Boldridge*, 274 Kan. 795, 57 P.3d 8, *cert. denied* 538 U.S. 950 (2003) (noting that defendant cited to *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 [2002]). The defendant recognizes that the court has spoken on this issue, but asks the court to reconsider its opinion. It is clear, however, that the unanimous decisions in *Conley*, *Douglas*, and *Boldridge* were correctly decided and are controlling on this issue.

Affirmed.